PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

       *Plaintiff-Appellee,*

v.

BRIAN LEE GOULD,

       *Defendant-Appellant.*

No. 08-4302

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William D. Quarles, Jr., District Judge.
(1:07-cr-00359-WDQ-1)

Argued: January 28, 2009

Decided: June 18, 2009

Before NIEMEYER and MICHAEL, Circuit Judges, and
Arthur L. ALARCÓN, Senior Circuit Judge of the United
States Court of Appeals for the Ninth Circuit, sitting by
designation.

Affirmed by published opinion. Judge Niemeyer wrote the
opinion, in which Senior Judge Alarcón joined. Judge
Michael wrote a dissenting opinion.

## COUNSEL

**ARGUED:** Paresh S. Patel, OFFICE OF THE FEDERAL
PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant.

Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, Baltimore, Maryland, for Appellant. Bonnie S. Greenberg, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

---

## OPINION

NIEMEYER, Circuit Judge:

In this appeal we determine whether Brian Lee Gould was properly convicted under the Sex Offender Registration and Notification Act ("SORNA"), Pub. L. No. 109-248, §§ 101-155, 120 Stat. 587, 590-611 (2006) (codified at 42 U.S.C. § 16901 *et seq.* and 18 U.S.C. § 2250), for failing to register in Maryland as a sex offender when Maryland had not yet implemented SORNA's enhanced registration requirements.

Gould was convicted of a sex offense in the District of Columbia in 1985 and, upon his release in 2002, was required to register, by pre-SORNA federal and state law, as a sex offender in the State in which he resided, worked, or was a student. *See* 42 U.S.C. §§ 14071(b),(c), 14072(c),(g),(i); D.C. Code § 22-4014. In early 2004, Gould moved to West Virginia; in late 2004 to Pennsylvania; and in 2006 to Maryland. Gould was convicted in West Virginia for failing to update his registration and was charged in Pennsylvania with failing to update his registration. He never registered in Maryland.

On July 27, 2006, before Gould moved to Maryland, Congress enacted SORNA, which expanded the information required to be provided on registration and created a federal requirement that sex offenders "register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is

a student." 42 U.S.C. § 16913(a). SORNA also criminalized the failure to register. *See* 18 U.S.C. § 2250(a).

Approximately one year after SORNA was enacted, Gould was arrested in Maryland and charged with violating SORNA, 18 U.S.C. § 2250(a), for failing to register in Maryland. After the district court denied Gould's motion to dismiss, in which he raised statutory and constitutional challenges, Gould pleaded guilty, reserving for appeal his statutory and constitutional challenges.

Gould contends that the district court should have dismissed his indictment because (1) he could not have been prosecuted for failure to register under SORNA because Maryland had not yet implemented SORNA; (2) he was "unable" to "*initially* register," as required by SORNA, 42 U.S.C. § 16913(b), because he was released from prison on his underlying sex offense long before SORNA was enacted; (3) he could not have "knowingly" failed to register in accordance with SORNA because he was not specifically instructed of SORNA's requirements, as required by 42 U.S.C. § 16917 and the regulations promulgated by the Attorney General; (4) prosecution without notification of his duty to register violated his rights under the Due Process Clause; (5) the Attorney General violated the Administrative Procedure Act in promulgating the interim regulations at 28 C.F.R. § 72 (2007) without notice and comment; and (6) SORNA violates the Commerce Clause by regulating "purely local intrastate activity that has nothing to do with commerce or any type of economic enterprise."

We reject each of Gould's arguments for the reasons that follow and affirm the judgment of the district court.

I

In 1985, Gould was convicted in the District of Columbia for assault with intent to commit sodomy while armed, in vio-

lation of D.C. Code §§ 22-503 and 22-3502 (1981). Since his release from prison in 2002, Gould has remained on parole under the supervision of the United States Parole Commission.

Gould moved to West Virginia in March 2004, and he duly registered there as a sex offender. But later that same year, he was charged and convicted of failing to update his registration pursuant to a continuing legal duty under West Virginia law to do so and was sentenced to 90 days' imprisonment.

In December 2004, Gould moved to Pennsylvania, where he again registered as a sex offender. But again he was charged in Pennsylvania with failing to comply with the requirement to update his registration. Before he could be arrested, however, he left Pennsylvania for Maryland, and on May 23, 2007, a warrant was issued in Pennsylvania for his arrest.

Before leaving Pennsylvania, Gould advised his parole officer of his intent to leave Pennsylvania, and the officer told Gould that he was not permitted to leave the State. Gould nonetheless moved to Maryland on August 21, 2006. He failed to keep two appointments, on August 21 and August 28, required by his parole officer in Pennsylvania, prompting a United States Parole Commissioner to issue a warrant for his arrest on August 31, 2006.

Gould failed to register as a sex offender in Maryland. In July 2007, he was arrested in Maryland on the warrant issued by the Parole Commissioner and was subsequently charged with failure to register as a convicted sex offender, in violation of SORNA, 18 U.S.C. § 2250(a). The indictment read:

> Between on or about August 21, 2006, and continuing until on or about July 18, 2007, in the District of Maryland, Brian Lee Gould . . . , an individual required to register under [SORNA] by reason of a

conviction under Federal law and the law of the District of Columbia for Assault with Intent to Commit Sodomy while Armed, and an individual who traveled in interstate and foreign commerce after being required to register, did knowingly fail to register and update a registration as required by SORNA.

Gould filed a motion to dismiss the indictment, raising the statutory and constitutional grounds asserted in this appeal, and the district court denied the motion with a written opinion. *See United States v. Gould*, 526 F. Supp. 2d 538 (D. Md. 2007). Gould thereafter entered a guilty plea, reserving the right to appeal the district court's order denying his motion to dismiss, and the district court sentenced him to 24 months' imprisonment.

On appeal, Gould claims that SORNA does not, by its terms, authorize his prosecution for a violation of SORNA and that, in any event, SORNA is unconstitutional both on its face and as applied to him.

II

Gould contends first that he cannot be prosecuted for failing to register under SORNA because Maryland has not yet implemented SORNA. He asserts that "SORNA does not impose a direct federal mandate on individuals to register . . . . Instead, it merely sets forth registration standards that it encourages states [through the Spending Clause of the Constitution] to incorporate into their local laws by July 2009 at the earliest." He reasons that "because Maryland has not yet implemented SORNA, [he] was not subject to its constraints and could not be legally punished for violating the Act." Gould argues that to "conclude that SORNA applies in pre-implementation states would prematurely force states to register offenders under SORNA's terms before they choose to adopt the Act. Such reading would render meaningless the provision in SORNA [at 42 U.S.C. § 16924] that clearly gives

states until at least July 2009 to make this choice and comply with the Act."

Gould's argument depends on a construction of SORNA that links the requirement imposed on individual sex offenders to register to the requirement imposed on the States to implement the registration standards mandated by SORNA in a manner that would have the requirement imposed on individuals be dependent on the State's implementation.[1] The language of SORNA, however, does not provide that linkage.

SORNA § 141(a), entitled "Criminal Penalties for Nonregistration," provides in relevant part:

> Whoever —
>
>> (1) is required to register under [SORNA];
>>
>> (2) (A)  is a sex offender as defined for the purposes of [SORNA] by reason of a conviction under Federal law . . . [or] the law of the District of Columbia . . . ; or
>>
>>     (B)  travels in interstate or foreign commerce . . . ; and

---

[1]Exercising its power under the Spending Clause, Congress directed each State "to substantially implement this subchapter" or lose "10 percent of the funds that would otherwise be allocated for that fiscal year" to the State under the Omnibus Crime Control and Safe Streets Act of 1968. 42 U.S.C. § 16925(a). Implementation requires, for example, that the State "maintain a jurisdiction-wide sex offender registry conforming to the requirements of [SORNA]," *id.* § 16912(a); "provide a criminal penalty" for a sex offender's failure to register, *id.* § 16913(e); "make available on the Internet . . . all information about each sex offender in the registry," *id.* § 16918(a); and "provide the information in the registry . . . about that offender" to various national and local law enforcement agencies and community organizations, *id.* § 16921(b).

> (3)   knowingly fails to register or update a registration as required by [SORNA];

shall be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C. § 2250(a). The requirement to "register or update a registration" is imposed by SORNA § 113(a), which provides:

> A sex offender shall register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student. For initial registration purposes only, a sex offender shall also register in the jurisdiction in which convicted if such jurisdiction is different from the jurisdiction of residence.

42 U.S.C. § 16913(a). Thus, to establish a criminal violation of SORNA in this case, the government was required to show (1) that Gould was required to register under 42 U.S.C. § 16913(a) as a sex offender residing in Maryland; (2) that he was convicted of an offense under District of Columbia law that made him a sex offender, *see id.* § 16911(1),(5) (defining "sex offender" and "sex offense"), *or* that he traveled in interstate commerce; and (3) that he "knowingly" failed to register as required by § 16913(a).

The parties do not dispute that Gould was a sex offender by reason of his conviction under District of Columbia law or that after his conviction he traveled to Maryland where he knowingly failed to register as a sex offender. The question at issue is whether SORNA required Gould to register in Maryland before Maryland implemented SORNA by amending its registration facilities to comport with the enhanced standards imposed by SORNA, or, stated otherwise, whether Gould's registration obligations under SORNA § 113(a), 42

U.S.C. § 16913(a), were contingent on Maryland's implementation of the Act.

*First*, SORNA § 113(a)'s requirements to register and maintain registration are not expressly conditioned on a State's implementation of the Act, which is consistent with SORNA's purpose "to strengthen and increase the effectiveness of [*preexisting*] sex offender registration and notification." *See The National Guidelines for Sex Offender Registration and Notification* ("National Guidelines"), 73 Fed. Reg. 38030, 38030 (July 2, 2008). Preexisting law included the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act, enacted in 1994, which provided federal funding to States that enacted sex offender registration laws. *See* 42 U.S.C. § 14071. Subsequent amendments to the Jacob Wetterling Act provided criminal penalties of up to one year's imprisonment for certain sex offenders who failed to register in each State where the sex offender resided, worked, or went to school. *Id.* § 14072(i). By the time that SORNA was enacted in 2006, every State and the District of Columbia had enacted a sex offender registration law. Thus, under the Jacob Wetterling Act and the state laws enacted pursuant to that Act, Gould was required to register and maintain his registration in the District of Columbia, West Virginia, Pennsylvania, and Maryland. He failed to update his registrations as required by law in West Virginia and in Pennsylvania, and he failed to register altogether in Maryland, in violation of Md. Code Ann., Crim. Proc. §§ 11-704 to 11-707. Because Maryland had a pre-SORNA program under which Gould could register and indeed was required to register, Gould cannot claim that there was no place to register simply because Maryland had not implemented the enhanced standards of SORNA.[2] Thus, under the plain reading of SORNA, Gould's *failure to register* in Maryland was a federal crime

---

[2]If Gould could demonstrate that "uncontrollable circumstances" prevented him from registering in Maryland, he would have an affirmative defense to a violation of § 2250(a). *See* 18 U.S.C. § 2250(b).

under 18 U.S.C. § 2250(a), subject to federal punishment—a result consistent with SORNA's purpose of strengthening and increasing the effectiveness of sex offender registration laws.

*Second*, the structure of SORNA's requirements indicates a separateness of the sex offenders' individual duty to register and the State's duty to enhance its registries and standards as mandated by the Act. As the Attorney General's National Guidelines for SORNA note, "Some of the provisions in SORNA are formulated as *directions to sex offenders*, including those appearing in sections 113(a)-(b) . . . . Other SORNA provisions are cast as *directions to jurisdictions* . . . ." National Guidelines, 73 Fed. Reg. at 38048 (emphasis added). Thus, even though state implementation must be accomplished by July 27, 2009,[3] three years after SORNA's enactment, the registration requirement of SORNA § 113(a) was imposed immediately on sex offenders on July 27, 2006, the date of SORNA's enactment. As the National Guidelines explain: "SORNA's requirements [for sex offender registration] took effect when SORNA was enacted on July 27, 2006, and they have applied since that time to all sex offenders, including those whose convictions predate SORNA's enactment." National Guidelines, 73 Fed. Reg. at 38046. With respect to sex offenders convicted *before* the enactment of SORNA, however, we have held that the federal duty to register applies only after the Attorney General, by regulation, made clear that the Act applied to such sex offenders. *See United States v. Hatcher*, 560 F.3d 222, 227, 229 (4th Cir.

---

[3] A State need not enact any implementing legislation to be in compliance with SORNA. The National Guidelines provide that "[w]hile SORNA sets minimum standards for jurisdictions' registration and notification programs, it does not require that its standards be implemented by statute." National Guidelines, 73 Fed. Reg. at 38047. In fact, "the totality of a jurisdiction's rules . . . will be considered" in assessing a State's compliance with SORNA. *Id.* A State's failure to comply "results in a 10% reduction of federal justice assistance funding," *id.*, but it is not a defense for an individual's failure to register. *See United States v. Hinckley*, 550 F.3d 926, 939 (10th Cir. 2008).

2009). In *Hatcher*, we reasoned that because the Attorney General did not exercise his authority "to specify the applicability" of SORNA to previously convicted sex offenders until February 28, 2007, SORNA's registration requirement did not apply to previously convicted sex offenders until that date. *Id.* at 226-27.[4] But SORNA's registration requirements, which were applied to pre-SORNA offenders on February 28, 2007, are still requirements imposed on individuals and are not subject to the requirements imposed on the States, which were given a three-year grace period from the date of SORNA's enactment.

*Third*, the Attorney General, acting under 42 U.S.C. §§ 16912(b) and 16913(d) (directing the Attorney General to promulgate regulations and authorizing him "to specify the applicability of the requirements of this title to sex offenders convicted before the enactment of [SORNA] . . . or its implementation in a particular jurisdiction"), promulgated interim regulations, effective February 28, 2007, and final regulations (the National Guidelines), effective July 2, 2008. Interim Regulation 72.3 provided that "[t]he requirements of [SORNA] apply to all sex offenders, including sex offenders convicted . . . prior to the enactment of that Act." 28 C.F.R. § 72.3 (2007); *Applicability of the Sex Offender Registration and Notification Act*, 72 Fed. Reg. 8894, 8897 (Feb. 28, 2007); *see also Hatcher*, 560 F.3d at 229 (holding that registration requirement for pre-SORNA sex offenders applies, effective February 28, 2007). In issuing the Interim Regulations, the Attorney General explained that "[i]n contrast to SORNA's provision of a three-year grace period for jurisdictions to implement its requirements, *SORNA's direct federal law reg-*

---

[4]Unlike the facts in *Hatcher*, where the defendant was charged with failing to register *before* the Attorney General issued his regulations, *see* 560 F.3d at 226, Gould was charged with failing to register during a period that ended "on or about July 18, 2007," several months *after* the Attorney General issued his regulations on February 28, 2007. Thus, our holding in *Hatcher* that Hatcher could not be charged with failing to register before the regulations were issued does not assist Gould in this case.

*istration requirements for sex offenders are not subject to any deferral of effectiveness*." 72 Fed. Reg. at 8895 (emphasis added); *see also* National Guidelines, 73 Fed. Reg. at 38046. Indeed, the National Guidelines, which have the force of law, *see* 42 U.S.C. §§ 16912(b), 16913(d), emphasize, with greater particularity, that "SORNA applies to all sex offenders, including those convicted of their registration offenses prior to the enactment of SORNA or *prior to particular jurisdictions' incorporation of the SORNA requirements into their programs*." 73 Fed. Reg. at 38063 (emphasis added).

For the reasons given, Gould's contention that SORNA's registration requirement did not apply to him because Maryland has not yet implemented SORNA's requirements is foreclosed. We conclude that the requirement imposed on individuals to register is independent of the requirement imposed on the States to implement the enhanced registration and notification standards of SORNA. Accordingly, SORNA's requirement that a sex offender register applies whether registration would be accomplished through pre-SORNA registration facilities or under SORNA-compliant programs. Because Gould did not register in Maryland as of July 18, 2007, he became criminally liable under 18 U.S.C. § 2250(a) for his failure to register. *See United States v. Hinckley*, 550 F.3d 926, 939 (10th Cir. 2008) (rejecting defendant's argument that it was impossible for him to register in Oklahoma under SORNA because the State had not passed legislation implementing SORNA); *United States v. Dixon*, 551 F.3d 578, 582 (7th Cir. 2008) (rejecting defendant's argument that he could not comply with SORNA's registration requirements because Indiana had not passed legislation implementing SORNA).

III

Gould also claims that "[p]unishing [him] for failing to register under SORNA—a law that does not yet apply to him—violates the Ex Post Facto Clause of the Constitution." As he

acknowledges, the Ex Post Facto Clause prohibits punishment of a defendant "for an act which was not punishable at the time it was committed." *Weaver v. Graham*, 450 U.S. 24, 28 (1981).

Gould's argument, however, rests on his contention that SORNA could not apply to him until Maryland implemented SORNA. Inasmuch as we reject this contention, we also reject his argument under the Ex Post Facto Clause. Gould was punished for *failing to register* during the period *after* SORNA was enacted, beginning at least as early as February 28, 2007, when the Attorney General issued his Interim Regulations clarifying that SORNA applied to pre-SORNA sex offenders. Because Gould was punished for his *conduct after enactment* of the SORNA provision criminalizing the conduct, his punishment does not violate the Ex Post Facto Clause.

IV

Gould contends next that he was "unable" to "initially register," as required by SORNA because § 16913(b), which addresses "initial registration," requires sex offenders to "initially register" under SORNA *before completing their sentences* for the sex offense. *See* 42 U.S.C. § 16913(b),(d). Gould asserts that because he was released from prison on his sex offense in 2002—years before SORNA was enacted—he could not have complied with the initial registration requirement. Gould also claims that the Attorney General's National Guidelines, promulgated under § 16913(d) (authorizing the Attorney General "to prescribe rules for the registration of . . . other categories of sex offenders who are unable to comply with subsection (b) [initial registration]"), "command that an individual who is 'unable' to 'initially register' under § 16913(b) only has a duty to register pursuant to SORNA after the state in which he resides implements SORNA, he is fully instructed of SORNA's requirements, and he receives signed acknowledgment of these instructions," citing the National Guidelines, 73 Fed. Reg. at 38063. Gould concludes

that "[b]ecause Maryland has not met any of these mandates, [he] had no duty to register under SORNA and could not be legally punished under 18 U.S.C. § 2250 for violating the Act." As an extension of this argument, Gould also argues that punishing him for violating SORNA, a law with which he was unable to comply, would violate the Due Process Clause.

Gould's argument bootstraps on his first argument, that because Maryland has not implemented SORNA, he is unable to register there in compliance with SORNA. But, as we pointed out in Part II above, a sex offender is able to register under SORNA if he is able to register by means of an existing state registration facility, even if he was released before SORNA was enacted. This was clarified by the Attorney General's Interim Regulations and the National Guidelines. The National Guidelines provide:

> SORNA applies to all sex offenders, including those convicted of their registration offenses prior to the enactment of SORNA or prior to particular jurisdictions' incorporation of the SORNA requirements into their programs. Jurisdictions are specifically required to register such sex offenders if they remain in the system as prisoners, supervisees, or registrants, or if they later reenter the system because of conviction for some other crime (whether or not the new crime is a sex offense).

National Guidelines, 73 Fed. Reg. at 38063. The National Guidelines also state that SORNA is to be applied to sex offenders who "are already registered or *subject to a pre-existing sex offender registration requirement* under the jurisdiction's law." *Id.* at 38046 (emphasis added). Maryland had a sex-offender registration facility, and Gould was required to register in Maryland in accordance with preexisting Maryland law. Indeed, Gould stipulated when he pleaded guilty in this case that Maryland law required him to register in Maryland and that he "knowingly failed to register" there.

Gould was thus not a sex offender who fell into the narrow class of offenders "unable to comply" with initial registration. *See* 42 U.S.C. § 16913(d). He could be a member of that limited class of persons only if he were one who was required to register under SORNA but who was not previously required to register under state law. *See, e.g.*, *Hinckley*, 550 F.3d at 933, 934 n.6 (holding that "sex offenders unable to comply with subsection (b)" are "*currently unregistered* offenders with dated convictions that might not be able to comply with the initial registration requirements" (emphasis added)); *United States v. Lawrance*, 548 F.3d 1329, 1336 (10th Cir. 2008) (maintaining that the defendant was not an offender unable to initially register because he "was convicted of a sexual offense in July 2002, was informed of his duty to register as a sex offender, and did so in Arizona"—even though he was released from prison prior to SORNA's enactment); *United States v. Waybright*, 561 F. Supp. 2d 1154, 1171 (D. Mont. 2008) (noting that "the definition of 'sex offense' under SORNA is broader than under most states' current registration laws").

In short, Gould was fully aware of his registration duties and *was able* to comply with them. He registered in West Virginia and in Pennsylvania, and he was convicted in West Virginia for failing to update his registration there. In addition, he stipulated that he received a letter from Pennsylvania officials reminding him of his registration duties. Finally, he stipulated that he knew he was required to register in Maryland and knowingly failed to do so.

SORNA made Gould's knowing failure to register in Maryland, a place where he resided, a federal offense. As the Attorney General stated, in promulgating his Interim Regulations:

> SORNA *directly* imposes registration obligations on sex offenders *as a matter of federal law* and provides for federal enforcement of these obligations under circumstances supporting federal jurisdiction.

* * *

> In contrast to SORNA's provision of a three-year grace period for jurisdictions to implement its requirements, SORNA's *direct federal law registration requirements* for sex offenders are not subject to any deferral of effectiveness. They took effect when SORNA was enacted on July 27, 2006, and currently apply to all offenders in the categories for which SORNA requires registration.

72 Fed. Reg. at 8895 (emphasis added). The "initial registration" provisions of SORNA, as construed by the Interim Regulations, simply do not provide Gould with a defense based on an inability to register before completion of his sentence. He was able to register in Maryland when he moved there after SORNA was enacted.

V

Gould contends that he cannot be punished under 18 U.S.C. § 2250(a) for "knowingly" failing to register under SORNA because the government did not inform him of SORNA's requirements as mandated by the Act's notice provision. *See* 42 U.S.C. § 16917. Because 18 U.S.C. § 2250(a) requires a knowing violation as an element of the offense, the essence of Gould's argument is that the government did not allege a *prima facie* violation of § 2250(a). For a defendant to be convicted of failing to register, he must "*knowingly* fail[ ] to register or update a registration as required by [SORNA]." 18 U.S.C. § 2250(a)(3) (emphasis added). Gould argues that even though he knew he was violating Maryland law by failing to register, he did not know that he was violating SORNA.

This argument, however, overlooks the fact that SORNA's criminal provision is not a specific intent law. In 18 U.S.C. § 2250(a), "knowingly" modifies "fails to register." There is no language requiring specific intent or a willful failure to

register such that he must know his failure to register violated federal law. *See Bryan v. United States*, 524 U.S. 184, 192-93 (1998) (noting that "the term 'knowingly' does not necessarily have any reference to a culpable state of mind or to knowledge of the law" and that "the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense"). And as a general matter, ignorance of the law does not provide a defense, for the law presumes that every person knows the law. *See Cheek v. United States*, 498 U.S. 192, 199 (1991). To assume otherwise would lead to the inability to enforce criminal provisions against persons not learned in the law or unaware of specific statutes.

Gould argues further that even in the absence of actual notice of criminal liability, due process requires that a statute not criminalize "wholly passive conduct." Like the defendant in *Lambert v. California*, 355 U.S. 225, 228 (1957), Gould claims that he is being prosecuted for wholly passive conduct —*i.e.*, his failure to register. In *Lambert*, when considering a city ordinance that required all felons to register, the Supreme Court noted that "circumstances which might move [a felon] to inquire as to the necessity of registration are completely lacking" with respect to such a law. *Id.* at 229.

Unlike an isolated city ordinance that requires all members of the broad class of all felons to register, however, SORNA criminalizes the failure to register of a much more narrowly targeted class of persons in context where sex-offender registration has been the law for years and Gould knew that. When SORNA was enacted, every State had registration requirements for sex offenders. Moreover, as we pointed out, Gould registered in West Virginia and Pennsylvania, was convicted in West Virginia for failing to update his registration, and was notified by letter in Pennsylvania of his continuing duties to register and update his registration. In addition, he stipulated in this case that he *knowingly* failed to register in Maryland. These circumstances do not allow for the conclusion that Gould's due process rights, based on lack of notice,

were violated. *See United States v. May*, 535 F.3d 912, 921 (8th Cir. 2008) (holding that notice of the duty to register under state law provides notice of the duty to register under SORNA); *Hinckley*, 550 F.3d at 938 (same); *see also Gould*, 526 F. Supp. 2d at 544 n.8 (collecting cases).

VI

Gould also contends that Interim Regulation 72.3, 28 C.F.R. § 72.3 (2007), which clarified that SORNA applied to those convicted before SORNA was enacted, was promulgated in violation of the Administrative Procedure Act ("APA"), specifically 5 U.S.C. § 553, because it was promulgated without providing the required 30-day notice for comment and because the Attorney General's reliance on the "good cause" exception to the notice and comment requirement was misplaced. Gould points out that "when the regulation was issued, the federal [Jacob] Wetterling Act (Megan's Law) as well as state registration laws were already in effect and carried criminal penalties to sufficiently protect the public," obviating the "good cause" relied on by the Attorney General.

The APA requires that notice of a proposed rule be given by publication in the Federal Register, 5 U.S.C. § 553(b), and that publication be accomplished in accordance with law "not less than 30 days before [the rule's] effective date, except . . . as otherwise provided by the agency for good cause found and published with the rule," *id.* § 553(d)(3). If the agency relies on the good cause exception, it must include a "brief statement" for finding that the notice and service are "impracticable, unnecessary, or contrary to the public interest." *Id.* § 553(b)(B). Judicial review requires that the good cause exception be construed narrowly. *See Utility Solid Waste Activities Group v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001).

In this case, the Attorney General issued the Interim Regulations on February 28, 2007, without notice and comment,

invoking the good cause exception. 72 Fed. Reg. at 8896-97. The Attorney General explained:

> The immediate effectiveness of this rule is necessary to eliminate any possible uncertainty about the applicability of the Act's requirements—and related means of enforcement, including criminal liability under 18 U.S.C. § 2250 for sex offenders who knowingly fail to register as required—to sex offenders whose predicate convictions predate the enactment of SORNA. Delay in the implementation of this rule would impede the effective registration of such sex offenders and would impair immediate efforts to protect the public from sex offenders who fail to register through prosecution and the imposition of criminal sanctions. The resulting practical dangers include the commission of additional sexual assaults and child sexual abuse or exploitation offenses by sex offenders that could have been prevented had local authorities and the community been aware of their presence, in addition to greater difficulty in apprehending perpetrators who have not been registered and tracked as provided by SORNA. This would thwart the legislative objective of "protect[-ing] the public from sex offenders and offenders against children" by establishing "a comprehensive national system for the registration of those offenders," SORNA § 102, because a substantial class of sex offenders could evade the Act's registration requirements and enforcement mechanisms during the pendency of a proposed rule and delay in the effectiveness of a final rule.

*Id.*

In the circumstances, we conclude that the Attorney General had good cause to invoke the exception to providing the 30-day notice. There was a need for legal certainty about

SORNA's "retroactive" application to sex offenders convicted before SORNA and a concern for public safety that these offenders be registered in accordance with SORNA as quickly as possible. Delaying implementation of the regulation to accommodate notice and comment could reasonably be found to put the public safety at greater risk. In addition, the Attorney General did provide for and receive post-promulgation public comments, which were addressed in the proposed National Guidelines issued in May 2007 and ultimately in the final National Guidelines issued in July 2008. *See* 72 Fed. Reg. at 8896 (Feb. 28, 2007); 72 Fed. Reg. 30210 (May 30, 2007); 73 Fed. Reg. 38030 (July 2, 2008).

## VII

Finally, Gould contends that SORNA is unconstitutional as exceeding Congress' power under the Commerce Clause "because regulating registration within a state is a purely local intrastate activity that does not substantially affect interstate commerce."

As noted above, the elements of a SORNA failure-to-register offense under 18 U.S.C. § 2250(a) are that the defendant (1) was required to register under 42 U.S.C. § 16913(a); (2) was previously convicted of a sex offense under District of Columbia law *or* traveled in interstate commerce; and (3) *knowingly* failed to register as required by § 16913(a). Thus, even if the act of failing to register is a local activity, that element alone does not amount to a violation of the offense. The defendant must also travel in interstate commerce. *See* 18 U.S.C. § 2250(a)(2)(B).[5] This is hardly different from—

---

[5]Section 2250(a) justifies federal jurisdiction for a SORNA failure-to-register offense also by reason of a defendant's conviction for a sex offense under federal or District of Columbia law. *See* 18 U.S.C. § 2250(a)(2)(A). Even though Gould also satisfies this basis for jurisdiction, we need not address it because Gould traveled in interstate commerce.

indeed more clearly implicates interstate commerce than—the local act of engaging a person under 18 years of age in a commercial sex act, which is criminalized under federal law in 18 U.S.C. § 1591 when the conduct or its circumstances are in or affect interstate commerce. *See also* 18 U.S.C. § 922(g) (illegal possession of a firearm); 18 U.S.C. § 1201 (kidnapping); Hobbs Act, 18 U.S.C. § 1951 (robbery and extortion); 18 U.S.C. § 2261 (domestic violence); 18 U.S.C. § 2313 (sale or receipt of a stolen motor vehicle); Mann Act, 18 U.S.C. § 2421 *et seq.* (prostitution). In these statutes, Congress regulated local conduct in the circumstance when the conduct implicated interstate commerce. Similarly, even if a failure to register is a local act, Congress can regulate it when it implicates the Commerce Clause.

Under the Commerce Clause, Congress has authority to regulate (1) "the use of the *channels* of interstate commerce," (2) "the *instrumentalities* of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities," and (3) "those activities having a *substantial relation* to interstate commerce." *United States v. Morrison*, 529 U.S. 598, 609 (2000) (emphasis added) (quoting *United States v. Lopez*, 514 U.S. 549, 558-59 (1995)) (internal quotation marks omitted).

Thus, Congress has "the authority . . . to keep the channels of interstate commerce free from immoral and injurious uses." *Caminetti v. United States*, 242 U.S. 470, 491 (1917) (upholding against a Commerce Clause challenge the Mann Act, which prohibited the transport of women "in interstate commerce" for an immoral purpose); *see also Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256 (1964) (upholding against a Commerce Clause challenge the constitutionality of Title II of the Civil Rights Act of 1964, which banned racial discrimination in public accommodations, noting that the Commerce Clause allows "Congress to keep the channels of interstate commerce free from immoral and injurious uses" (quoting *Caminetti*, 242 U.S. at 491)). Indeed we

have applied these principles to uphold analogous statutes. In *United States v. Bailey*, 112 F.3d 758 (4th Cir. 1997), we upheld the interstate domestic violence statute, 18 U.S.C. § 2261(a), making it illegal to travel across a state line "with the intent to injure, harass, or intimidate" a spouse or intimate partner and intentionally commit a crime of violence against that person, as validly enacted pursuant to Congress' Commerce Clause authority because "[t]he statute requires the crossing of a state line, thus placing the transaction squarely in interstate commerce." *Bailey*, 112 F.3d at 766.

Congress also has the authority to regulate persons in interstate commerce, especially persons who move from the State of conviction to another State and there fail to register, as they use "instrumentalities of interstate commerce." *See United States v. Ambert*, 561 F.3d 1202, 1210-11 (11th Cir. 2009); *Lawrance*, 548 F.3d at 1337 ("SORNA clearly intends to regulate interstate activity, *i.e.*, the evasion of sex offender registration requirements by sex offenders who have crossed jurisdictional lines").

Gould contends, however, that because § 2250(a) "does not mandate any nexus between the act of failing to register and interstate travel," § 2250(a)(2)(B) invokes unlimited power because almost everyone at some point travels in interstate commerce. He argues that "the mere fact that the individual has, at some point, traveled in interstate commerce does not establish that his or her subsequent failure to register 'substantially affects interstate commerce.'" But SORNA is not so expansive. It requires additional elements and a specific sequence. To satisfy the commerce component of § 2250(a), a sex offender must have been convicted of a qualifying sex offense and, after conviction, traveled to another State and failed to register or maintain his registration. There must be a conviction that gives rise to the registration requirement, subsequent interstate travel, and a failure to register. In this case, Gould satisfied these elements and his interstate travel followed his conviction of a sex offense that gave rise to his

requirement to register in Maryland. Thus he was properly convicted under § 2250(a).

Our conclusion that § 2250(a) does not violate the Commerce Clause is also consistent with decisions of other circuits that have reached this issue. *See Ambert*, 561 F.3d at 1210-12 (upholding § 2250(a) "under either of the first two *Lopez* categories because it regulates both the use of channels of interstate commerce and the instrumentalities of interstate commerce" and upholding § 16913(a) because the section "is reasonably adapted to the attainment of a legitimate end under the commerce clause"); *Hinckley*, 550 F.3d at 939-40 (rejecting defendant's challenge to § 2250(a) under the Commerce Clause because he was a "'person . . . in interstate commerce,' [and] he also used the channels of interstate commerce on a daily basis" and because "the Commerce Clause allows Congress to keep the channels of interstate commerce free from immoral and injurious uses" (internal quotation marks omitted)); *May*, 535 F.3d at 921 ("SORNA thus derives its authority from each prong of *Lopez*—and most specifically, the ability to regulate 'persons or things in interstate commerce' and 'the use of the channels of interstate commerce.' May was undeniably a 'person . . . in interstate commerce' in that he traveled and relocated between various states, and traveled among many other states . . . via the 'use of the channels of interstate commerce'"); *see also Dixon*, 551 F.3d at 583 (summarily rejecting defendant's Commerce Clause argument, noting that the defendant "must in the heat of argument have forgotten the Mann Act"); *see also United States v. Howell*, 552 F.3d 709, 714-17 (8th Cir. 2009) (upholding the constitutionality of § 16913(a) as a "rational and appropriate means to further Congress's regulation of interstate commerce").

Beyond regulating the channels and instrumentalities of commerce in criminalizing the failure to register, Congress also devised "a comprehensive national system" for the registration of sex offenders, *see* 42 U.S.C. § 16901, drawing on its commerce power, although not explicitly, as it did in

§ 2250(a). This absence of an explicit reference to the commerce power does not, however, render unconstitutional the national system so long as the enactment addresses a problem that substantially affects interstate commerce. As the Supreme Court observed:

> While congressional findings are certainly helpful in reviewing the substance of a congressional statutory scheme, particularly when the connection to commerce is not self-evident, and while we will consider congressional findings in our analysis when they are available, the absence of particularized findings does not call into question Congress' authority to legislate.

*Gonzales v. Raich*, 545 U.S. 1, 21 (2005). The question remains whether Congress properly exercised its power to regulate "those activities that substantially affect interstate commerce." *Lopez*, 514 U.S. at 559; *see also Raich*, 545 U.S. at 17; *Wickard v. Filburn*, 317 U.S. 111, 125 (1942) ("But even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce . . ."). In resolving this question, a court determines whether Congress had a rational basis for a statute's enactment. *See Raich*, 545 U.S. at 22 ("In assessing the scope of Congress' authority under the Commerce Clause, . . . [w]e need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding" (quoting *Lopez*, 514 U.S. at 557)).

In establishing a comprehensive national system for registration of sex offenders, Congress recognized that sex offenders constitute a unique class of criminal insofar as members of that class are considered to have higher rates of recidivism than other offenders. *See* H.R. Rep. No. 109-218, pt. 1, at 22-23 (2005) (finding that "[s]ex offenders have recidivism rates

that often exceed those of other criminals"); Patrick A. Langan et al., U.S. Dep't of Justice, *Recidivism of Sex Offenders Released from Prison in 1994*, at 24 (2003), *available at* http://www.ojp.usdoj.gov/bjs/pub/pdf/rsorp94.pdf (reporting a 5.3% recidivism rate for 9,691 sex offenders released in 1994 within three years); R. Karl Hanson & Monique T. Bussiere, *Predicting Relapse: A Meta-Analysis of Sexual Offender Recidivism Studies*, 66 J. of Consulting & Clinical Psychol. 348, 351 (1998) (surveying studies showing a recidivism rate averaging 13.4%); Marnie E. Rice & Grant T. Harris, *What Population and What Question?*, 48 Canadian J. of Criminology & Crim. Just. 95, 97-99 (2006) (discussing recidivism rates of 24% or higher in various studies). Congress was also dealing with an extensive interstate movement of recidivists seeking to avoid state-created registration requirements. When the high incidence of recidivism is coupled with the interstate movement of sex offenders intending to avoid state registration or to seek more lax registration requirements, Congress could rationally perceive a need to create *national* standards for sex-offender registration and notification.

In 1994, Congress enacted the Jacob Wetterling Act, 42 U.S.C. § 14071 *et seq.*, which encouraged States to create facilities for the registration of sex offenders and for notification to law enforcement officers of registration data. As a result of the Jacob Wetterling Act, all States and the District of Columbia established sex-offender registration programs, although different in nature and scope. In addition, through subsequent amendments to the Jacob Wetterling Act, Congress also established a national database at the FBI. *See* 42 U.S.C. § 14072.

Some 10 years later, however, Congress found that the patchwork of standards that resulted from the various state programs and piecemeal amendments had left loopholes and gaps that allowed for numerous heinous crimes. Moreover, crimes committed by previously convicted sexual offenders were increasing in number, and those required to register

under state laws were "disappearing." Congress determined that the patchwork should be replaced with a new comprehensive set of national standards, as The National Guidelines explain:

> While sex offender registration and notification in the United States are generally carried out through programs operated by the individual states and other non-federal jurisdictions, their effectiveness depends on also having effective arrangements for tracking of registrants as they move among jurisdictions and some national baseline of registration and notification standards. In a federal union like the United States with a mobile population, sex offender registration could not be effective if registered sex offenders could simply disappear from the purview of the registration authorities by moving from one jurisdiction to another, or if registration and notification requirements could be evaded by moving from a jurisdiction with an effective program to a nearby jurisdiction that required little or nothing in terms of registration and notification.

National Guidelines, 73 Fed. Reg. at 38045. These observations were well supported by the concerns expressed by Congress in the debates leading up to the enactment of SORNA. Legislators repeatedly criticized state "loopholes," "disparities," and "deficiencies," which allowed an excess of 100,000 registrants to become "lost." *See, e.g.*, H.R. Rep. No. 109-218, pt. 1, at 23-24 (2005); 151 Cong. Rec. H7887, H7889 (daily ed. Sept. 14, 2005) (statement of Rep. Green); *id.* at H7893 (statements of Rep. Royce and Rep. Graves); 152 Cong. Rec. S8012, S8018 (daily ed. July 20, 2006) (statement of Sen. Allen); *id.* at S8020 (statement of Sen. Cantwell); *id.* at S8022 (statement of Sen. DeWine); *id.* at S8030 (statement of Sen. Frist); *House Bills on Sexual Crimes Against Children: Hearing on H.R. 764, H.R. 95, H.R. 1355, H.R. 1505, H.R. 2423, H.R. 244, H.R. 2796, and H.R. 2797 Before the Subcomm. on*

*Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary* ("*House Bills on Sexual Crimes Against Children*"), 109th Cong. 1, 9-11 (2005) (statement of Rep. Poe); *id.* at 11-13 (statement of Rep. Brown-Waite). Emphasizing the interstate nature of the sex-offender problem, Senator Orrin Hatch, a co-sponsor of SORNA, explained the importance of creating uniform standards for the registration of sex offenders:

> This is critical to sew together the patch-work quilt of 50 different State attempts to identi[f]y and keep track of sex offenders. . . . Laws regarding registration for sex offenders have not been consistent from State to State[;] now all States will lock arms and present a unified front in the battle to protect children. Web sites that have been weak in the past, due to weak laws and haphazard updating and based on inaccurate information, will now be accurate, updated and useful for finding sex offenders.

152 Cong. Rec. S8012, S8012-13 (daily ed. July 20, 2006) (statement of Sen. Hatch). Senator Joseph Biden, another co-sponsor, stated: "This is about uniting 50 States in common purpose and in league with one another to prevent these lowlifes from slipping through the cracks." *Id.* at S8013 (statement of Sen. Biden). Senator Arlen Specter observed that the state laws alone "proved to be relatively ineffective, which requires the Federal Government to act on the national level." *Id.* at S8029 (statement of Sen. Specter). And Representative Ginny Brown-Waite emphasized that "Congress has a duty to act and to protect our children nationwide, because these predators move from state to state." *House Bills on Sexual Crimes Against Children*, at 13 (statement of Rep. Brown-Waite).

A concern was also expressed that sex offenders "forum-shop" for States with lax registration laws. Ernie Allen, President and CEO of the National Center for Missing and

Exploited Children, testified before the House Judiciary Committee that the lack of "consistency" and "uniformity" in state registration laws allowed sex offenders to "forum-shop" among States:

> The public has a right to know about all registered sex offenders living in our communities. The amount of protection a child is given shouldn't depend on the state in which that child lives. There is clearly a need for more uniformity among state programs of community notification of sex offenders.

*Protecting Our Nation's Children from Sexual Predators and Violent Criminals: What Needs To Be Done? Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 109th Cong. 19 (2005) (statement of Ernie Allen).

Thus, Congress, motivated by a desire to prevent sex offenders from traveling among the States to avoid state registration, used its commerce power to enact a national program mandating stronger and the more comprehensive registration system, as contained in SORNA. And in SORNA, it so stated:

> In order to protect the public from sex offenders and offenders against children, and in response to the vicious attacks by violent predators against the victims listed below, *Congress in this Act establishes a comprehensive national system* for the registration of those offenders: [listing the names of 17 victims].

42 U.S.C. § 16901 (emphasis added).

Even though the comprehensive federal registration system created by SORNA may implicate a sex offender who does not cross state lines, the potential for recidivism and flight across state lines of *all* sex offenders is sufficiently real and substantial to be taken as a serious and extensive part of the

larger interstate problem, justifying the comprehensive regulation. "The question is not simply whether one particular offense has a measurable impact upon interstate commerce, but whether the relevant class of acts has such an impact." *United States v. Williams*, 342 F.3d 350, 355 (4th Cir. 2003) (upholding the Hobbs Act under the Commerce Clause). Requiring *all* sex offenders to register is an integral part of Congress' regulatory effort and "the regulatory scheme could be undercut unless the intrastate activity were regulated." *Raich*, 545 U.S. at 24-25 (quoting *Lopez*, 514 U.S. at 561); *see also Hodel v. Indiana*, 452 U.S. 314, 329 n.17 (1981) ("A complex regulatory program . . . can survive a Commerce Clause challenge without a showing that every single facet of the program is independently and directly related to a valid congressional goal. It is enough that the challenged provisions are an integral part of the regulatory program and that the regulatory scheme when considered as a whole satisfies this test").

In sum, we find no basis to support Gould's contention that § 2250(a), criminalizing his failure to register, violates the Commerce Clause.

The judgment of the district court is

*AFFIRMED*.

MICHAEL, Circuit Judge, dissenting:

The Sex Offender Registration and Notification Act (SORNA or Act), 42 U.S.C. § 16901 et seq., delegates substantial rulemaking authority to the United States Attorney General. Under § 113(d) the Attorney General is granted "the authority to specify the applicability of the requirements of [the Act] to sex offenders convicted before July 27, 2006 or [SORNA's] implementation in a particular jurisdiction" and the authority "to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders

who are unable to comply with" the Act's initial registration requirements. 42 U.S.C. § 16913(d) (2006). Section 112(b) further directs the Attorney General to "issue guidelines and regulations to interpret and implement" the Act. 42 U.S.C. § 16912(b).

The Attorney General does not dispute that, in exercising his rulemaking authority under each of these provisions, he was subject to the procedural requirements of the Administrative Procedure Act (APA), 5 U.S.C. § 551 et seq. Nor does he dispute that he failed to comply with the APA's procedures when he promulgated, pursuant to § 113(d), the rule regarding SORNA's retroactivity and applicability in pre-implementation jurisdictions. Because the Attorney General's justification for non-compliance with the APA was inadequate, the rule promulgated under § 113(d) (codified at 28 C.F.R. § 72.3) is invalid. And because Gould's prosecution under SORNA depends upon this invalid rule, I respectfully dissent from the majority's decision to affirm Gould's conviction under the Act.

I.

Section 113(a) of SORNA provides that: "A sex offender shall register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student." 42 U.S.C. § 16913(a). The statute, however, expressly leaves unresolved the issue of its applicability to sex offenders, like Gould, whose convictions predate the enactment of SORNA or its implementation in particular jurisdictions. *See* 42 U.S.C. § 16913(d). Section 113(d) further authorizes the Attorney General "to prescribe rules for the registration of such sex offenders and for other categories of sex offenders who are unable to comply with" SORNA's initial registration requirements. 42 U.S.C. § 16913(d). Because SORNA, as enacted, did not specify its application to past sex offenders, Gould was not subject to prosecution under the Act until the Attor-

ney General made this determination. *See United States v. Hatcher*, 560 F.3d 222 (4th Cir. 2009).

Pursuant to his rulemaking authority under § 113(d), the Attorney General issued an "interim rule" on February 28, 2007, clarifying that "the requirements of [SORNA] apply to all sex offenders (as defined in that Act), including those convicted of the offense for which registration is required prior to the enactment of the Act." 72 Fed. Reg. 8894, 8896 (Feb. 28, 2007) (codified at 28 C.F.R. § 72.3 (2007)). The Attorney General explained that:

> In contrast to SORNA's provision of a three-year grace period for jurisdictions to implement its requirements, SORNA's direct federal law registration requirements for sex offenders are not subject to any deferral of effectiveness. They took effect when SORNA was enacted on July 27, 2006, and currently apply to all offenders in the categories for which SORNA requires registration.

72 Fed. Reg. at 8895.

In issuing the interim rule, the Attorney General declined to comply with the public notice and comment procedures required under the APA. Subsection 553(b) of the APA broadly requires that notice of all proposed rules be published in the Federal Register. 5 U.S.C. § 553(b). Subsection 553(c) further provides that:

> After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

5 U.S.C. § 553(c). Except as provided by statute, the requirements of notice and comment rulemaking pursuant to § 553(b) and (c) do not apply:

> (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

> (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

5 U.S.C. § 553(b)(A), (B). The APA also requires the publication of any substantive rule at least thirty days before its effective date, 5 U.S.C. § 553(d), except where the rule is interpretive, where the rule grants an exception or relieves a restriction, or "as otherwise provided by the agency for good cause found and published with the rule," *id.*

The Attorney General relied upon the good cause exception in § 553(b)(B) to excuse the lack of public notice and comment for the interim rules. He likewise relied on the good cause exception in § 553(d)(3) to excuse delaying implementation of the rule. He claimed that notice and comment was "impracticable, unnecessary, or contrary to the public interest" as provided in 5 U.S.C. § 553(b)(B), explaining that:

> The immediate effectiveness of this rule is necessary to eliminate any possible uncertainty about the applicability of the Act's requirements—and related means of enforcement, including criminal liability under 18 U.S.C. 2250 for sex offenders who knowingly fail to register as required—to sex offenders whose predicate convictions predate the enactment of SORNA. Delay in the implementation of this rule would impede the effective registration of such sex

offenders and would impair immediate efforts to protect the public from sex offenders who fail to register through prosecution and the imposition of criminal sanctions. The resulting practical dangers include the commission of additional sexual assaults and child sexual abuse or exploitation offenses by sex offenders that could have been prevented had local authorities and the community been aware of their presence, in addition to greater difficulty in apprehending perpetrators who have not been registered and tracked as provided by SORNA. This would thwart the legislative objective of "protect[ing] the public from sex offenders and offenders against children" by establishing "a comprehensive national system for the registration of those offenders," SORNA § 102, because a substantial class of sex offenders could evade the Act's registration requirements and enforcement mechanisms during the pendency of a proposed rule and delay in the effectiveness of a final rule.

It would accordingly be contrary to the public interest to adopt this rule with the prior notice and comment period normally required under 5 U.S.C. 553(b) or with the delayed effective date normally required under 5 U.S.C. 553(d).

72 Fed. Reg. at 8896-97.

Although the interim rule was accompanied by a request for post-promulgation comments, the Attorney General never published a response to any comments that he may have received. The Attorney General also sought comments in the Federal Register notice for the proposed guidelines under § 112(b), *see* 72 Fed. Reg. 30210, 30210 (May 30, 2007), and did address these comments in the final guidelines issued on July 2, 2008, *see* 73 Fed. Reg. 38030, 38030-32 (July 2, 2008).

Because the Attorney General lacked sufficient justification for failing to comply with the APA's notice and comment requirements in promulgating the rule under § 113(d) (28 C.F.R. § 72.3), the rule is invalid and may not serve as the basis for Gould's prosecution and conviction under SORNA.

A.

The bar for invoking § 553(b)(B)'s good cause exception is a high one: "The exception excuses notice and comment in emergency situations, or where delay could result in serious harm." *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (internal citation removed); *see also Nat'l Nutritional Foods Ass'n v. Kennedy*, 572 F.2d 377, 384 (2d Cir. 1978) ("The legislative history of the Administrative Procedure Act demonstrates that Congress intended the exceptions in § 553(b)(B) to be narrow ones."). "If conclusory statements that normal procedures were not followed because of the need to provide immediate guidance and information constituted 'good cause,' then an exception to the notice requirement would be created that would swallow the rule." *Zhang v. Slattery*, 55 F.3d 732, 746, 747 (2d Cir. 1995) (internal quotations and alterations omitted) (noting that "a largely conclusory statement" that a rule's "immediate promulgation is necessary in order to benefit the greatest number of" affected parties "is not enough" because, "[p]resumably, agencies deem all their rules beneficial; the notice and comment requirement would be a dead letter if compliance could be excused whenever the beneficial effect would thereby be accelerated").

Courts have therefore "looked askance at agencies' attempts to avoid the standard notice and comment procedures, holding that exceptions under § 553 must be 'narrowly construed and only reluctantly countenanced' in order to assure that 'an agency's decisions will be informed and responsive.'" *Asiana Airlines v. FAA*, 134 F.3d 393, 396 (D.C. Cir. 1998) (quoting *N.J. Dep't of Envtl. Prot. v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980)).

In promulgating the February 28, 2007, rule, the Attorney General elected to rely on the public interest element of § 553(b)(B)'s good cause exception. "[T]he Attorney General's Manual states that [the public interest exception] 'connotes a situation in which the interest of the public would be defeated by any requirement of advance notice,' as when announcement of a proposed rule would enable the sort of . . . manipulation the rule sought to prevent." *Util. Solid Waste Activities Group v. EPA*, 236 F.3d 749, 755 (D.C. Cir. 2001) (quoting U.S. Dept. of Justice, *Attorney General's Manual on the Administrative Procedure Act* 31 (1947)). We must therefore consider whether the public interest would have been defeated by allowing notice and comment before promulgating the interim rule.

The Attorney General argues that the public interest would be harmed by delay. Specifically, he contends that delay "would impede the effective registration of [ ] sex offenders [to whom coverage was extended under the interim rule] and would impair immediate efforts to protect the public from sex offenders who fail to register through prosecution and the imposition of criminal sanctions." 72 Fed. Reg. at 8896. According to the Attorney General, SORNA's objective of protecting the public from sex offenders and specified offenders against children would be thwarted by delay "because a substantial class of sex offenders could evade the Act's registration requirements and enforcement mechanisms during the pendency of a proposed rule and delay in the effectiveness of a final rule." *Id.* at 8897. This purported justification does not withstand examination.

First, the Attorney General's declaration in 28 C.F.R. § 72.3 that SORNA applies retroactively and applies in jurisdictions that have yet to implement the Act did not have the immediate effect of compelling any additional sex offenders to register; nor did it provide any additional registration information either to states or to the federal government. The announcement of the rule merely allowed the federal govern-

ment to prosecute under SORNA sex offenders who were currently violating state registration laws and thus were already subject to prosecution under existing state laws. The Attorney General's July 2, 2008, final guidance makes clear that if Maryland had lacked an existing registry or if Gould's crime required registration under SORNA but not under Maryland's existing law, Gould would not be required to register until Maryland had affirmatively taken steps to register him, including "fully instructing [him] about the SORNA requirements, obtaining signed acknowledgments of such instructions, and obtaining and entering into the registry all information about [him] required under SORNA." 73 Fed. Reg. at 38063. These steps could not occur until Maryland elected to implement SORNA, a decision Maryland was granted up to five years to make. *See* 42 U.S.C. § 16924.

Further, under the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Program (Megan's Law), 42 U.S.C. § 14071 et seq., the federal government already possessed the power to prosecute many of the sex offenders who became subject to prosecution under SORNA following the promulgation of 28 C.F.R. § 72.3. Under Megan's Law, which remains in effect until at least July 27, 2009, *see* 42 U.S.C. § 16924(a), 16929, the federal government has the authority to prosecute essentially any offender who would be subject to prosecution under SORNA based upon his interstate movement. *Compare* 42 U.S.C. § 14072(g), (i) (Megan's Law) (providing for federal criminal prosecution of any person who knowingly fails to register under a state's sexual offender registration program and who changes address to another state) *with* 18 U.S.C. § 2250(a) (SORNA) (providing for prosecution of any sex offender who knowingly fails to register or update a registration as required by SORNA and "travels in interstate or foreign commerce, or enters or leaves, or resides in, Indian country").

Second, the Attorney General's assertion that harm to the general public would result from delay assumes that it was

inevitable that he would declare that SORNA applied retroactively and in pre-implementation jurisdictions. If the Attorney General had promulgated a rule that SORNA does *not* apply to past sex offenders or those in pre-implementation jurisdictions, no possible harm to the public would have resulted from the delay; these offenders would never have become subject to federal prosecution under SORNA. In contrast, past sex offenders were undoubtedly harmed by the Attorney General's decision not to consider their views in promulgating the interim rule.

Third, to the extent the Attorney General believed that delay must be avoided to "eliminate any possible uncertainty about the applicability of the Act's requirements" (particularly for jurisdictions considering whether to implement SORNA's requirements), he significantly undercut this rationale by requesting post-promulgation comments on 28 C.F.R. § 72.3. If post-promulgation input was solicited out of a genuine interest in considering the public's views regarding the applicability and implementation of SORNA, it would have made considerably more sense for the Attorney General to have requested the comments *prior* to promulgating the interim rule, as the APA requires. This is especially true because the possibility of an alteration to the interim rule after its promulgation *increases* rather than eliminates uncertainty.

On the other hand, if the Attorney General was not genuinely interested in considering the public's views, requesting post-promulgation comments makes a sham of the APA's rulemaking procedures. Indeed, "[i]t is antithetical to the structure and purpose of the APA for an agency to implement a rule first, and then seek comment later." *Paulsen v. Daniels*, 413 F.3d 999, 1005 (9th Cir. 2005). This is so because "[s]ection 553 is designed to give affected parties an opportunity to participate in agency decisionmaking early in the process, when the agency is more likely to consider alternative ideas." *N. Arapahoe Tribe v. Hodel*, 808 F.2d 741, 751 (10th Cir. 1987). "Notice and comment procedures afford interested

parties a meaningful opportunity to participate in the rulemaking process and assure that an agency's decisions will be informed and responsive." *Mobil Oil Corp. v. Dept. of Energy*, 728 F.2d 1477, 1490 (Temp. Emer. Ct. App. 1983).

In *U.S. Steel Corp. v. EPA*, 595 F.2d 207 (5th Cir. 1979), the Environmental Protection Agency (EPA) advanced the argument that "despite its lack of literal compliance with § 553 [it] satisfied the intent of § 553 by accepting post-promulgation comments and keeping an open mind about revisions." *Id.* at 214. The Fifth Circuit disagreed:

> The EPA overlooks . . . the crucial difference between comments before and after rule promulgation. Section 553 is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas.

*Id.* Thus, the court rejected EPA's argument that "even if it was obliged to afford opportunity for § 553 notice and comment before making the designations, its failure to do so was cured by its acceptance of comments after the effective date." *Id.* Adopting EPA's argument, the court said, "would lead in the long run to depriving parties affected by agency action of any way to enforce their § 553 rights to pre-promulgation notice and comment." *Id.* The same reasoning applies in this case.

Finally, any contention that jurisdictions needed clarity about the retroactive application of SORNA before deciding whether to implement the Act is insufficient to invoke the good cause exception in this case. Jurisdictions were afforded three full years (extendable for an additional two years) to implement SORNA. 42 U.S.C. § 16924(a), (b). Courts have enforced § 553's procedural requirements where states were given considerably shorter time frames in which to act in

response to agency rulemaking. *See U.S. Steel Corp. v. EPA*, 649 F.2d 572 (8th Cir. 1981) (less than one year time frame for states to draft state implementation plans under Clean Air Act after EPA promulgated list of areas not in attainment for national ambient air quality standards); *W. Oil & Gas. Ass'n v. EPA*, 633 F.2d 803 (9th Cir. 1980) (same); *N.J. Dep't of Envtl. Prot. v. EPA*, 626 F.2d 1038 (D.C. Cir. 1980) (same); *Sharon Steel Corp. v. EPA*, 597 F.2d 377 (3d Cir. 1979) (same); *U.S. Steel Corp. v. EPA*, 595 F.2d 207 (5th Cir. 1979) (same); *but see Republic Steel Corp. v. Costle*, 621 F.2d 797 (6th Cir. 1980) (upholding failure to comply with APA requirements for same issue); *U.S. Steel Corp. v. EPA*, 605 F.2d 283 (7th Cir. 1979) (same). Further, even if states were given a shorter deadline to work with, the tight deadline would not excuse the Attorney General's invocation of good cause. "As a general matter, strict congressionally imposed deadlines, without more, by no means warrant invocation of the good cause exception." *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1236 (D.C. Cir. 1994) (internal quotations omitted). Indeed, in spite of the Attorney General's hurried rulemaking, no state thus far has elected to implement SORNA, and the Attorney General recently granted a blanket one-year extension to all jurisdictions to allow substantial implementation of the Act. *See* http://www.ojp.usdoj.gov/smart/pdfs/sornaorder.pdf.

Ultimately, if Congress truly wanted the Attorney General to make a determination regarding the retroactivity of SORNA without engaging in the required notice and comment and receiving outside input, it had several options. Congress could have simply declared SORNA to apply retroactively and to apply in each jurisdiction prior to that jurisdiction's implementation of the Act. Alternatively, Congress could have expressly waived the APA's procedural requirements. *See Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998) (noting that "when Congress sets forth specific procedures that express its clear intent that APA notice and comment procedures need not be followed, an agency

may lawfully depart from the normally obligatory procedures of the APA") (internal quotations and alterations omitted). The fact that Congress delegated significant rulemaking responsibility to the Attorney General and did not expressly streamline the rulemaking procedures suggests that Congress did not want the Attorney General to take his responsibility lightly and avoid public participation in the rulemaking process. *See Levesque v. Block*, 723 F.2d 175, 185 (1st Cir. 1983) ("[I]f Congress was troubled by th[e] prospect [of a delay in rulemaking], it could have mandated immediate implementation."). For these reasons, the Attorney General did not properly invoke § 553(b)(B)'s good cause exception.

### B.

The Attorney General's decision to forgo the required 30-day waiting period before 28 C.F.R. § 72.3 went into effect similarly cannot be excused by good cause. Although courts have regarded § 553(d)(3)'s good cause standard as distinct from and somewhat more flexible than § 553(b)(B)'s good cause standard, *see Am. Fed'n of Gov't Employees v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981), the Attorney General's failure to engage in the required waiting period in this case raises important concerns in addition to those implicated by the lack of notice and comment. The decision here not to delay implementation of the rule resulted in a complete lack of notice to pre-SORNA sex offenders, such as Gould, that they would be subject to federal prosecution and a prison term of up to ten years effective immediately on February 28, 2007, when the Federal Register notice was published.

As courts have explained, "the purpose of the thirty-day waiting period is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect." *Omnipoint Corp. v. FCC*, 78 F.3d 620, 630 (D.C. Cir. 1996). Thus, "[i]n determining whether good cause exists, an agency should 'balance the necessity for immediate implementation against principles of fundamental fairness which require that

all affected persons be afforded a reasonable amount of time to prepare for the effective date of its ruling.'" *Id.* (quoting *United States v. Gavrilovic*, 551 F.2d 1099, 1105 (8th Cir. 1977)). Because sex offenders were subject to immediate federal prosecution under SORNA when the interim rule was announced on February 28, 2007, *see United States v. Hatcher*, 560 F.3d 222 (4th Cir. 2009), on that date, with no prior notice, Gould was suddenly committing a crime punishable by up to ten years in prison. *See* 18 U.S.C. § 2250(a); *cf.* 42 U.S.C. § 14072(i) (one year maximum sentence for first-time Megan's Law violation); Md. Code Ann., Crim. Proc. § 11-721(b) (three year maximum sentence for first-time failure to register under Maryland law). In light of the very substantial new penalties and the lack of compelling justification for avoiding delay, giving sex offenders no grace period in which to register is wholly inconsistent with § 553(d)(3)'s concept of good cause.

## II.

It is clear that the Attorney General promulgated 28 C.F.R. § 72.3 in violation of the APA. The remaining issue is therefore one of remedy. "It is fundamental law that a rule promulgated by a federal agency is not valid unless adopted in substantial compliance with the requirements of the APA." *N. Am. Coal Corp. v. Dir. Office of Workers' Comp. Programs*, 854 F.2d 386, 388 (10th Cir. 1988). As the Ninth Circuit thoughtfully explained, courts

> must exercise great caution in applying the harmless error rule in the administrative rulemaking context. The reason is apparent: Harmless error is more readily abused there than in the civil or criminal trial context. An agency is not required to adopt a rule that conforms in any way to the comments presented to it. So long as it explains its reasons, it may adopt a rule that all commentators think is stupid or unnecessary. Thus, if the harmless error rule were to look

> solely to result, an agency could always claim that it would have adopted the same rule even if it had complied with the APA procedures. To avoid gutting the APA's procedural requirements, harmless error analysis in administrative rulemaking must therefore focus on the process as well as the result. We have held that the failure to provide notice and comment is harmless only where the agency's mistake clearly had no bearing on the procedure used or the substance of decision reached.

*Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1487 (9th Cir. 1992) (internal quotations omitted); *see also Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 260 F.3d 1365, 1375 (Fed. Cir. 2001) ("Failure to allow notice and comment, where required, is grounds for invalidating the rule"). I agree. The appropriate remedy in this case is invalidation of the rule and reversal of Gould's conviction on the ground that the application of SORNA to Gould relies on the invalid rule.

I recognize that the Attorney General would be within his authority to promulgate the same rule and guidelines after engaging in the APA's required notice and comment period. *See Riverbend Farms*, 958 F.2d at 1487. Indeed, it may be that, at most, minimal substantive changes would arise from requiring the Attorney General to promulgate a new rule in compliance with § 553's procedural requirements. Nevertheless, I believe holding the rule invalid and reversing Gould's conviction is warranted because allowing the Attorney General to sidestep the requirements of the APA here establishes a dangerous precedent. In cases, for example, where the challengers of a regulation represent familiar economic interests, courts routinely enforce compliance with the APA's procedural safeguards. *See, e.g.*, *Util. Solid Waste Activities Group v. EPA*, 236 F.3d 749 (D.C. Cir. 2001); *Mobil Oil Corp. v. EPA*, 35 F.3d 579 (D.C. Cir. 1994); *Tenn. Gas Pipeline Co. v. FERC*, 969 F.2d 1141 (D.C. Cir. 1992); *U.S. Steel Corp. v.*

*U.S. EPA*, 595 F.2d 207 (5th Cir. 1979). Here, where the adversely affected group—sex offenders — is a despised and marginalized one, the "public interest" is invoked to exclude them from the rulemaking process. The APA does not draw such a distinction.