IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 108,061

STATE OF KANSAS,
*Appellee*,

v.

HENRY PETERSEN-BEARD,
*Appellant.*

SYLLABUS BY THE COURT

1.

Lifetime postrelease registration for sex offenders mandated by the Kansas Offender Registration Act, K.S.A. 22-4901 *et seq.*, does not constitute punishment for purposes of applying provisions of the United States Constitution. Contrary holdings in *State v. Redmond*, 304 Kan. ___, ___ P.3d ___ (No. 110,280, this day decided), *State v. Buser*, 304 Kan. ___, ___ P.3d ___ (No. 105,982, this day decided), and *Doe v. Thompson*, 304 Kan. ___, ___ P.3d ___ (No. 110,318, this day decided), are overruled.

2.

Lifetime postrelease registration for sex offenders mandated by the Kansas Offender Registration Act, K.S.A. 22-4901 *et seq.*, does not constitute punishment for purposes of applying § 9 of the Kansas Constitution Bill of Rights.

Review of the judgment of the Court of Appeals in an unpublished opinion filed August 9, 2013. Appeal from Saline District Court; RENE S. YOUNG, judge. Opinion filed April 22, 2016. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

1

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Christina M. Trocheck*, first assistant county attorney, argued the cause, and *Ellen Mitchell*, county attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: Henry Petersen-Beard challenges his sentence to lifetime postrelease registration as a sex offender pursuant to the Kansas Offender Registration Act (KORA), K.S.A. 22-4901 *et seq.*, as cruel and unusual punishment in violation of § 9 of the Kansas Bill of Rights and the Eighth Amendment to the United States Constitution. Because we find that lifetime registration as a sex offender pursuant to KORA is not punishment for either Eighth Amendment or § 9 purposes, we reject Petersen-Beard's argument that it is unconstitutionally cruel and/or unusual and affirm his sentence. In so doing, we overrule the contrary holdings of *State v. Redmond*, 304 Kan. ___, ___ P.3d ___ (No. 110,280, this day decided), *State v. Buser*, 304 Kan. ___, ___ P.3d ___ (No. 105,982, this day decided), and *Doe v. Thompson*, 304 Kan. ___, ___ P.3d ___ (No. 110,318, this day decided).

FACTUAL AND PROCEDURAL BACKGROUND

Petersen-Beard pled guilty to and was convicted of one count of rape for having sexual intercourse with a 13-year-old girl when he was 19 years old. Prior to sentencing, he filed motions asking the district court to depart from the presumptive guidelines sentence and to declare KORA's requirement of lifetime registration unconstitutional under § 9 of the Kansas Bill of Rights and the Eighth Amendment to the United States Constitution. The district court granted Petersen-Beard's motion for a downward durational departure but denied his request to find KORA's lifetime registration

2

requirements unconstitutional. As such, the district court sentenced Petersen-Beard to 78 months' imprisonment with lifetime postrelease supervision and lifetime registration as a sex offender—the lowest sentence permitted by law.

Petersen-Beard appealed the district court's ruling to the Court of Appeals but did not prevail. *State v. Petersen-Beard*, No. 108,061, 2013 WL 4046444 (Kan. App. 2013) (unpublished opinion). Petersen-Beard now brings his appeal to this court reprising the arguments he made below that the requirement in Kansas law of lifetime registration as a sex offender is unconstitutional. We granted Petersen-Beard's petition for review pursuant to K.S.A. 20-3018(b), exercise jurisdiction pursuant to K.S.A. 60-2101(b), and affirm.

ANALYSIS

*Standard of Review*

This appeal requires us to decide whether KORA's mandatory lifetime sex offender registration as set forth in K.S.A. 22-4901 *et seq.*, runs afoul of either the Eighth Amendment's prohibition against "cruel and unusual punishments" or § 9's prohibition against "cruel or unusual punishment." The constitutionality of a statute is a question of law over which this court exercises plenary review. *State v. Mossman*, 294 Kan. 901, 906, 281 P.3d 153 (2012). "We presume statutes are constitutional and must resolve all doubts in favor of a statute's validity." *State v. Soto*, 299 Kan. 102, 121, 322 P.3d 334 (2014). "It is not the duty of this court to criticize the legislature or to substitute its view on economic or social policy; it is the duty of this court to safeguard the constitution." *State ex rel. Six v. Kansas Lottery*, 286 Kan. 557, 562, 186 P.3d 183 (2008).

Typically, challenges arising under either the Eighth Amendment or § 9, or both, attack criminal sanctions against persons convicted of crimes as being cruel and/or

unusual. Such is the case with Petersen-Beard's argument here. However, as the State points out, there remains a threshold question as to whether the challenged sanction is punishment at all for purposes of either the Eighth Amendment or § 9, or is rather a civil and nonpunitive sanction. Here, the State claims that KORA's requirement of lifetime sex offender registration in Petersen-Beard's case is not punishment at all and is therefore not subject to our normal cruel and unusual analysis. For the reasons set forth below, we agree.

*KORA's lifetime sex offender registration requirements are not punishment for purposes of applying the United States Constitution.*

In *Smith v. Doe*, 538 U.S. 84, 92, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003), the United States Supreme Court set out the following framework for analyzing whether a legislature's statutory scheme is punitive:

> "We must 'ascertain whether the legislature meant the statute to establish "civil" proceedings.' *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997). If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is '"so punitive either in purpose or effect as to negate [the State's] intention" to deem it "civil."' *Ibid.* (quoting *United States v. Ward*, 448 U.S. 242, 248-249 (1980)). Because we 'ordinarily defer to the legislature's stated intent,' *Hendricks*, *supra*, at 361, '"only the clearest proof" will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty,' *Hudson v. United States*, 522 U.S. 93, 100 (1997) (quoting *Ward*, *supra*, at 249, [100 S. Ct. at 2641]); see also *Hendricks*, *supra*, at 361; *United States v. Ursery*, 518 U.S. 267, 290 (1996); *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 365 (1984)."

This framework is often referred to as the "intent-effects" test. *Moore v. Avoyelles Correctional Center*, 253 F.3d 870, 872 (5th Cir. 2001). In *Smith v. Doe*, the Supreme

Court reasoned that a "conclusion that the legislature intended to punish" would resolve the question of the punitive nature of the statutory scheme "without further inquiry into its effects." 538 U.S. at 92-93. Applying the intent-effects test to KORA's lifetime registration provisions, we have held today in *Thompson* that our legislature intended those provisions of KORA to be a nonpunitive and civil regulatory scheme rather than punishment. See *Doe v. Thompson*, 304 Kan. ___, ___ P.3d ___ (No. 110,318, this day decided), slip op. at 22-31 (citing *State v. Myers*, 260 Kan. 669, 923 P.3d 1024 [1996] [lifetime postrelease registration under Kansas Sex Offender Registration Act was nonpunitive in nature], *cert. denied* 521 U.S. 1118 [1997]. We agree and do not disturb that aspect of *Thompson* or its companion cases. See *State v. Redmond*, 304 Kan. ___, ___ P.3d ___ (No. 110,280, this day decided), slip op. at 6; *State v. Buser*, 304 Kan. ___, ___ P.3d ___ (No. 105,982, this day decided), slip op. at 6.

Because the legislature did not intend for KORA's lifetime sex offender registration scheme to be punishment, we must next turn to the effect of those provisions to determine whether, by """the clearest proof,""" those effects "'override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.'" *Smith*, 538 U.S. at 92. The Supreme Court in *Smith* utilized the seven factors identified in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963), to decide whether the effects of the legislative enactment negated and overrode the legislature's intent to establish a civil regulatory scheme. *Smith*, 538 U.S. at 97. The *Mendoza-Martinez* factors are:

> "Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment— retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for

it, and whether it appears excessive in relation to the alternative purpose assigned . . . ." *Mendoza-Martinez*, 372 U.S. at 168-69.

While in *Smith*, the *Mendoza-Martinez* factors were applied to determine whether a lifetime registration scheme was punishment for ex post facto purposes rather than for purposes of the Eighth Amendment, there exists no analytical distinction between or among the different constitutional contexts in which the question of punishment versus a civil regulatory scheme can arise. "The common inquiry across the Court's Eighth Amendment, ex post facto, and double jeopardy jurisprudence is determining whether the government's sanction is punitive in nature and intended to serve as punishment." *Hinds v. Lynch*, 790 F.3d 259, 264 n.5 (1st Cir. 2015) (citing *Mendoza-Martinez*); see also *United States v. Under Seal*, 709 F.3d 257, 263-64 (4th Cir. 2013) (using *Mendoza-Martinez* factors to determine federal Sex Offender Registration and Notification Act (SORNA), 42 U.S.C. § 16901 *et seq.* (2012), is nonpunitive for purposes of the Eighth Amendment); *Myrie v. Commissioner*, *N.J. Dept. of Corrections*, 267 F.3d 251, 262 (3d Cir. 2001) (applying *Mendoza-Martinez* factors to an Eighth Amendment "Excessive Fines" Clause challenge); *Cutshall v. Sundquist*, 193 F.3d 466, 477 (6th Cir. 1999) (using *Mendoza-Martinez* factors to determine Tennessee's Sex Offender Registration and Monitoring Act was nonpunitive under the Eighth Amendment); *Hare v. City of Corinth, MS*, 74 F.3d 633, 651-52 (5th Cir. 1996) (Dennis, J., concurring) (using *Mendoza-Martinez* factors to evaluate whether a pretrial detainee was punished under the Eighth Amendment); *People v. Adams*, 144 Ill. 2d 381, 388, 581 N.E.2d 637 (1991) (court would have used *Mendoza-Martinez* factors to evaluate Eighth Amendment claim if conclusive evidence of legislative intent was unavailable); *In re Justin B.*, 405 S.C. 391, 404, 747 S.E.2d 774 (2013) (using *Mendoza-Martinez* to evaluate sex offender registration under the Eighth Amendment).

Given this, if KORA's lifetime sex offender registration requirement is punishment for either ex post facto or double jeopardy purposes, it must necessarily also be punishment for Eighth Amendment purposes. The reverse would likewise be true. Thus, while the question of whether KORA is punishment arises here in the context of the Eighth Amendment, we must necessarily address our decisions, issued today, in *Redmond*, *Buser*, and *Thompson*. In *Redmond*, *Buser*, and *Thompson*, we held that the identical statutory provisions we consider here are, in fact, punishment for ex post facto purposes. *Redmond*, 304 Kan. ___, ___, No. 110,280, slip op. at 9; *Buser*, 304 Kan. ___, ___, No. 105,982, slip op. at 12; *Thompson*, 304 Kan. ___, ___, No. 110,318, this day decided, slip op. at 44.

If we were to follow those holdings, we would conclude that KORA's lifetime sex offender registration requirement is punishment for Eighth Amendment purposes and we would proceed with a cruel and unusual analysis pursuant to established precedent. However, this court is persuaded that the holding of *Thompson*, *Buser*, and *Redmond* that KORA constitutes punishment is incorrect. We are instead convinced by the dissent in *Thompson* that a faithful application of federal precedents requires us to find that the provisions of KORA at issue here are not punitive for purposes of applying our federal Constitution. We therefore overrule the contrary holdings of *Thompson*, *Buser*, and *Redmond*.

Because we are persuaded by the *Thompson* dissent on this question, we take the unusual step of quoting liberally from that opinion and adopting its reasoning in toto:

> "Federal appellate courts have unanimously held retroactive application of the
> federal offender registration requirements found in SORNA does not violate the Ex Post
> Facto Clause. *United States v. Brunner*, 726 F.3d 299, 303 (2d Cir. 2013); *United States
> v. Parks*, 698 F.3d 1, 5-6 (1st Cir. 2012); *United States v. Felts*, 674 F.3d 599, 606 (6th
> Cir. 2012); *United States v. Elkins*, 683 F.3d 1039, 1045 (9th Cir. 2012); *United States v.*

7

*Leach*, 639 F.3d 769, 773 (7th Cir. 2011); *United States v. W.B.H.*, 664 F.3d 848, 860 (11th Cir. 2011); *United States v. Shenandoah*, 595 F.3d 151 (3d Cir.), *cert. denied* 560 U.S. 974 (2010), *abrogated on other grounds by Reynolds v. United States*, 565 U.S. ___, 132 S. Ct. 975, 181 L. Ed. 2d 935 (2012); *United States v. Gould*, 568 F.3d 459, 466 (4th Cir. 2009), *cert. denied* 559 U.S. 974 (2010); *Young*, 585 F.3d at 206 (noting that Young made no "effort to prove that the effect of SORNA is so punitive as to make it not a civil scheme, and any attempt to do so would have been futile"); *United States v. May*, 535 F.3d 912, 919-20 (8th Cir. 2008), *cert. denied* 556 U.S. 1258 (2009), *abrogated on other grounds by Reynolds*, 132 S. Ct. 975 (2012); *United States v. Hinkley*, 550 F.3d 926, 937-38 (10th Cir. 2008), *abrogated on other grounds by Reynolds v. United States*, 565 U.S. ___, 132 S. Ct. 975, 181 L. Ed. 2d 935 (2012); see also *United States v. Under Seal*, 709 F.3d 257, 265 (4th Cir. 2013) (applying *Mendoza-Martinez* factors to hold SORNA was not cruel and unusual punishment as applied to a juvenile); *United States v. Stacey*, 570 Fed. Appx. 213, 216 (3d Cir. 2014) (holding ex post facto challenge to conviction for failing to register under SORNA foreclosed by *Shenandoah*); *United States v. Sampsell*, 541 Fed. Appx. 258, 260 (4th Cir. 2013) (holding ex post facto challenge to SORNA foreclosed by *Gould*).

"In addition, federal circuit courts have upheld state sex offender registration laws against federal ex post facto challenges, even when those state laws contained provisions more expansive in scope and impact than either SORNA or the Alaska provisions addressed in *Smith*. See *Litmon v. Harris*, 768 F.3d 1237, 1242-43 (9th Cir. 2014) (upholding California requirement that offenders register in-person every 90 days); *American Civil Liberties Union of Nevada v. Masto*, 670 F.3d 1046, 1051, 1058 (9th Cir. 2012) (upholding Nevada law expanding category of individuals who must register, increasing time period offenders were subject to registration, adding in-person registration requirements, and expanding law enforcement obligations to notify specified entities that an offender resided nearby); *Doe v. Bredesen*, 507 F.3d 998, 1000 (6th Cir. 2007) (upholding Tennessee law requiring, among other things, extended lifetime registration and satellite-based monitoring with wearable GPS device); *Hatton v. Bonner*, 356 F.3d 955, 967 (9th Cir. 2004) (upholding California law containing several provisions different from the Alaska statute analyzed in *Smith*).

"The majority disingenuously characterizes this unanimous body of caselaw as just the decisions of 'a number of Federal Circuit Courts of Appeal,' which it then discounts by noting the obvious, *i.e.*, there are differences between the federal SORNA and our state's KORA. Slip op. at 44. And while it is true that none of the statutory schemes upheld by other courts are identical to KORA, there is substantial overlap, and so the rationale from those decisions should apply with equal force here. I would not so quickly disdain this federal caselaw because it compellingly answers the real question presented: Are there convincing reasons to believe the United States Supreme Court would view KORA differently than it viewed the Alaska law in 2003 when it decided *Smith*? See *Litmon*, 768 F.3d at 1243 ('[T]here is no reason to believe that the addition of [the 90-day, in-person registration] requirement would have changed the outcome [in *Smith*].'). If the answer to that question is no, then this court must affirm.

"[Given that the legislature did not intend KORA to be punishment], we must decide whether KORA is ""'so punitive either in purpose or effect as to negate [the State's] intention' to deem [KORA] 'civil.'"' *Smith*, 538 U.S. at 92. This is where I depart from the majority's analysis.

"For this second step, we should follow the federal factors laid out in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963). See *Smith*, 538 U.S. at 97. Those factors consider the degree to which the regulatory scheme imposes a sanction that: (1) has historically been regarded as punishment; (2) constitutes an affirmative disability or restraint; (3) promotes the traditional aims of punishment; (4) is rationally connected to a nonpunitive purpose; (5) is excessive in relation to the identified nonpunitive purpose; (6) contains a sanction requiring a finding of scienter; and (7) applies the sanction to behavior that is already a crime. *Mendoza-Martinez*, 372 U.S. at 168. In *Smith*, the Court focused on the first five as more relevant in evaluating Alaska's registration and notification law, concluding the remaining two were of 'little weight.' 538 U.S. at 105. I will do the same.

9

"The majority holds that the 2011 KORA 'crosses the line drawn by *Smith*' by too closely resembling the shaming punishments from the colonial period. Slip op. at 36-37. KORA does this, according to the majority, by posting the registrant's information on the Internet, 'branding' a registrant's driver's license with the letters 'RO,' and requiring quarterly registration in each location where an offender works, lives, or attends school. Let's take each of these in turn.

"*Posting offender information on the Internet*

"As summarized below, there is overwhelming federal authority holding that Internet posting of registrant information is not analogous to historical forms of punishment. The analysis used to reach that conclusion applies in equal force to KORA, regardless of other differences the statutory schemes may have. The majority overreaches by rejecting this caselaw and adopting a contrary view.

"In *Smith*, the United States Supreme Court held that Alaska's offender registration act could apply retroactively and '[t]he fact that Alaska posts the information on the Internet does not alter our conclusion.' 538 U.S. at 99. The Court held the posting requirement was not akin to historical punishments despite recognizing that it subjects the offender to public shame or humiliation because most of the information related to an already public criminal record and dissemination of it furthers a legitimate governmental objective. 538 U.S. at 99. The *Smith* Court explained:

> '[T]he stigma of Alaska's Megan's Law results not from public display
> for ridicule and shaming but from the dissemination of accurate
> information about a criminal record, most of which is already public. Our
> system does not treat dissemination of truthful information in furtherance
> of a legitimate governmental objective as punishment. On the contrary,
> our criminal law tradition insists on public indictment, public trial, and
> public imposition of sentence. Transparency is essential to maintaining
> public respect for the criminal justice system, ensuring its integrity, and

10

protecting the rights of the accused. The publicity may cause adverse consequences for the convicted defendant, running from mild personal embarrassment to social ostracism. In contrast to the colonial shaming punishments, however, the State does not make the publicity and the resulting stigma an integral part of the objective of the regulatory scheme.' 538 U.S. at 98-99.

"The *Smith* Court then added:

'The fact that Alaska posts the information on the Internet does not alter our conclusion. It must be acknowledged that notice of a criminal conviction subjects the offender to public shame, the humiliation increasing in proportion to the extent of the publicity. And the geographic reach of the Internet is greater than anything which could have been designed in colonial times. These facts do not render Internet notification punitive. The purpose and the principal effect of notification are to inform the public for its own safety, not to humiliate the offender. Widespread public access is necessary for the efficacy of the scheme, and the attendant humiliation is but a collateral consequence of a valid regulation.' 538 U.S. at 99.

In so holding, the Court's analysis recognizes the obvious—posting information on the Internet makes it far more accessible and subjects the offender to increased shame and humiliation. Nevertheless, the Court held that Internet posting did not make Alaska's statutory scheme punitive.

"The majority characterizes the *Smith* Court's 2003 analysis of the Internet as 'antiquated,' and then concludes: 'Any suggestion that disseminating sex offender registration [information] on an Internet website reaches no more members of the public and is no more burdensome to the offender than maintaining an archived criminal record simply ignores the reality of today's world.' Slip op. at 37-38.

11

"But as seen from its holding, *Smith* did not base its conclusion on some old-fashioned, dial-up modem/floppy disk notion of the World Wide Web; nor did it consider accessing offender information on the Internet nothing more than a walk to the courthouse to thumb through publicly available paper files. *Smith*'s rationale withstands the more recent development of a mobile, smartphone Internet. Indeed, these developments can be viewed as furthering the nonpunitive, public safety ends supporting offender registration because, as *Smith* acknowledged, '[w]idespread public access is necessary for the efficacy of the scheme.' *Smith*, 538 U.S. at 99. The majority simply disagrees with the Court's conclusion but needs a rationale for considering the question further. This becomes overwhelmingly evident when the authority from more recent courts applying *Smith* is acknowledged.

"Consider first the federal notification statute, SORNA. Similar to KORA, the federal law requires that offender information including the offenders' names, physical descriptions, photographs, criminal offenses, and criminal histories be made publicly available on the Internet. See 42 U.S.C. §§ 16914, 16918-16920 (2012). Under SORNA, the states and enumerated territories, including the District of Columbia and Puerto Rico, must each maintain websites for this purpose. See 42 U.S.C. §§ 16911(10); 16918(a) (2012). The federal government, in turn, must maintain a website containing 'relevant information for each sex offender and other person listed on a jurisdiction's Internet site.' 42 U.S.C. § 16920. Each of these websites must make the information obtainable 'by a single query for any given zip code or geographic radius set by the user.' 42 U.S.C. §§ 16918(a), 16920(b). And among SORNA's others mandates, an appropriate official must affirmatively distribute notice of an individual's sex offender status to 'each school and public housing agency' in the area where that sex offender resides. 42 U.S.C. § 16921(b)(2) (2012). In short, SORNA goes further than the Alaska scheme at issue in *Smith* and further than KORA as to affirmative notification of statutorily specified groups.

"Nevertheless, all federal circuits addressing whether SORNA's publication requirements are punitive have followed *Smith* and held they are not, despite candidly recognizing they can result in greatly increased public shame. See, *e.g.*, *Parks*, 698 F.3d at 5-6 (noting the disadvantages from the publicity attendant to SORNA's Internet

12

requirements 'are obvious' and refusing to invalidate SORNA due to 'wide dissemination' of offender's information, citing *Smith*); *Hinckley*, 550 F.3d at 937-38 ('SORNA, just as the *Smith* scheme, merely provides for the "dissemination of accurate information about a criminal record, most of which is already public"'); see also *United States v. Talada*, 631 F. Supp. 2d 797, 808 (S.D. W. Va. 2009) (citing *Smith* and upholding SORNA as a valid regulatory program even though it requires widespread Internet dissemination of offenders' information, a community notification program, and in-person reporting).

"Also persuasive is the Ninth Circuit's 2012 decision upholding retroactive application of a Nevada statute that, among other things, not only required Internet publication of registration information, but also active notification to specified groups over and above what was required by SORNA, such as youth and religious organizations. *Masto*, 670 F.3d at 1051. In rejecting any notion that these features were akin to historical forms of punishment, the Ninth Circuit held:

'Active dissemination of an individual's sex offender status does not alter the [*Smith*] Court's core reasoning that "stigma . . . results not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public." [Citation omitted.] Though "humiliation increas[es] in proportion to the extent of the publicity," the "purpose and the principal effect of notification are to inform the public for its own safety." [Citation omitted.]' 670 F.3d at 1056.

"There is also recent state court authority, relying heavily on *Smith*, that holds posting registered offenders' information on the Internet is not akin to traditional shaming punishments. See *Kammerer v. State*, 322 P.3d 827, 834-36 (Wyo. 2014) ('Although dissemination of information relating to a registrant's status as a sex offender may have negative consequences for the registrant, information regarding the offense is made public at the time of trial, and its publication under WSORA is merely a necessary consequence of the Act's intent to protect the public from harm.'); *State v. Letalien*, 2009 ME 130, ¶ 38, 985 A.2d 4 (2009) (Internet posting of sex offender information is not punitive in purpose or effect, citing *Smith*; Maine and federal Ex Post Facto Clauses are

coextensive); see also *Doe I v. Williams*, 2013 ME 24, ¶ 35, 61 A.3d 718 (2013) (following *Letalien*).

"I would follow this abundant caselaw and hold that KORA's Internet posting of information is not akin to historical shaming punishments. And in reaching that conclusion, I would further note the majority's discussion of the sharing functions available on the Johnson County Sherriff's website is irrelevant to the statute's constitutionality because KORA does not require this capability; and, just as importantly, the majority cites no authority that would find a federal ex post facto violation because of a nonstatutorily mandated software feature added by a local law enforcement agency.

"Regardless, given the overwhelming weight and substance of the caselaw rejecting federal ex post facto challenges based on widespread Internet dissemination of offender registration information, as well as the federal courts' more recent validations of *Smith*, I would not consider *Smith*'s rationale to be 'antiquated' or subject to easy dismissal, and I would not weigh this against the statute's constitutionality. The majority errs in this regard.

"*'Branding' a registrant's driver's license*

"Next, the majority declares that KORA 'mimics [the] shaming of old by branding the driver's license of a registrant with the designation, "RO."' Slip op. at 36. The majority is referring to K.S.A. 2011 Supp. 8-243, which provides that an offender's driver's license 'shall be assigned a distinguishing number by the division [of motor vehicles] which will readily indicate to law enforcement officers that such person is a registered offender. The division shall develop a numbering system to implement the provisions of this subsection.' This requirement, while not technically contained in KORA, differentiates Kansas laws from SORNA, although the statute only requires a distinguishing number and the 'RO' practice is just a decision by a state agency that is not specifically dictated by the statute. See K.S.A. 8-243(d).

"The majority draws support for its view from a divided decision in *Starkey v. Oklahoma Dept. of Corrections*, 2013 OK 43, 305 P.3d 1004 (2013), which considered

14

the Oklahoma Constitution's Ex Post Facto Clause. See Okla. Const., art. 2, § 15. But I do not find *Starkey* persuasive for several reasons.

"First, although the Oklahoma Supreme Court applied the intent-effects test, that court's majority suggests they applied a lower standard as to when the effects of a measure are punitive under the Oklahoma Ex Post Facto Clause by noting that the United States Constitution simply establishes a floor for constitutional rights in Oklahoma. 2013 OK 43, ¶ 45 ('How we apply the "intent-effects" test is not governed by how the federal courts have independently applied the same test under the United States Constitution as long as our interpretation is at least as protective as the federal interpretation.'). Second, Oklahoma's offender registry law imposed harsher restraints on offenders because of residency boundaries (minimum distance from schools, playgrounds, etc.) and a requirement that Oklahoma driver's licenses and identification cards spell out the term 'Sex Offender.' In contrast, KORA contains no residency exclusions and Kansas simply uses as a matter of state agency practice an abbreviation (RO), which applies equally to non-sex-offenders. Finally, the *Starkey* court relied upon the totality of the Oklahoma law's harsher circumstances when determining they weighed in favor of punishment. 2013 OK 43, ¶ 61 ('[W]e are not making a determination of the constitutionality of any of these individual registration requirements but for purposes of analyzing the second *Mendoza-Martinez* factor we find the totality of these requirements weigh in favor of punishment.').

"Offering a different analysis, the Louisiana Supreme Court's unanimous decision in *Smith v. State*, 84 So. 3d 487 (La. 2012), reached the opposite conclusion regarding its driver's license labeling and is more on point. In so holding, the Louisiana court acknowledged that including the words 'sex offender' printed in orange color on an offender's driver's license 'may be remotely similar to historical forms of punishment, such as public humiliation, [but] the immediate need for public protection was a corollary of, rather than an addendum to, the punishment for sex offenders.' *Smith*, 84 So. 3d at 496 n.7-8, 498. The court then concluded that the requirement of a notation on an offender's driver's license 'may be harsh, may impact a sex offender's life in a long-lived and intense manner, and also be quite burdensome to the sex offender, [but] we do not find them to constitute an infringement of the principles of *ex post facto*.' 84 So. 3d at 499.

15

"Admittedly, the Louisiana court did not articulate whether it was relying on the federal or state constitution for its holding, but this does not appear to make a difference because that court had previously held Louisiana's Ex Post Facto Clause offers the same protections because it was patterned after the United States Constitution. See *State ex rel. Olvieri v. State*, 779 So. 2d 735 (La. 2001). For this reason, I find the Louisiana decision more persuasive than the Oklahoma decision.

"*Quarterly Registration*

"Next, the majority labels KORA's quarterly, in-person registration requirements for each location where the offender works, lives, or attends school as 'a traditional means of punishment' by likening the requirement to probation or parole. (Slip op. at 38.) It does so without citation to any authority or explanation as to how quarterly reporting mandates offend federal ex post facto caselaw. Again, a review of the unanimous federal caselaw upholding SORNA is persuasive and leads to a contrary conclusion.

"SORNA's in-person reporting requirements differentiate between types of sex offenses in determining the frequency of in-person reporting. There must be in-person verification 'not less frequently than' once a year for Tier I sex offenders, twice a year for Tier II sex offenders, and four times per year for Tier III sex offenders. 42 U.S.C. § 16916 (2012); see 42 U.S.C. § 16911 (defining Tiers I, II, and III). In *Parks*, the First Circuit recently noted SORNA's in-person requirement was 'surely burdensome for those subject to it,' but nevertheless concluded this was not punitive, noting:

'To appear in person to update a registration is doubtless more inconvenient than doing so by telephone, mail or web entry; but it serves the remedial purpose of establishing that the individual is in the vicinity and not in some other jurisdiction where he may not have registered, confirms identity by fingerprints and records the individual's current appearance. Further, the inconvenience is surely minor compared to the disadvantages of the underlying scheme in its consequences for renting

16

housing, obtaining work and the like—consequences that were part of the package that *Smith* itself upheld.' 698 F.3d at 6.

See *Doe v. Pataki*, 120 F.3d 1263, 1281-82 (2d Cir. 1997); see also *Doe v. Cuomo*, 755 F.3d 105, 112 (2d Cir. 2014) (approving triennial, in-person reporting as being reasonably related to the nonpunitive, prospective goals of protecting the public and facilitating law enforcement efforts).

"Admittedly, KORA's reporting requirements are more burdensome than those in SORNA because under KORA, all sex offenders are subject to in-person registration four times per year, and drug and violent offenders must report in person a minimum of three times per year. K.S.A. 2011 Supp. 22-4905(b). KORA further requires an offender to report registration changes in person 'to the . . . agency or agencies where last registered.' (Emphasis added.) K.S.A. 2011 Supp. 22-4905(a), (g). In addition, the definition of 'reside' in KORA is broader than the definition in SORNA. Compare K.S.A. 2011 Supp. 22-4902(j) (definition of 'reside') with SORNA's 42 U.S.C. § 16911. Therefore, it is obvious KORA imposes a greater registration burden on the offender than SORNA. But the question is whether the federal courts would view these changes as tipping the balance. I think not.

"Consider again as an example *Matso* in which the Ninth Circuit rejected a federal ex post facto challenge to a Nevada law that essentially mirrored SORNA's registration requirements, but also expanded the category of individuals required to register, added to the frequency offenders were subject to registration, and required in-person registration. *Matso*, 670 F.3d at 1051; see also *Litmon*, 768 F.3d at 1242-43 (holding California's 90-day, in-person lifetime registration requirement does not violate federal ex post facto principles); *Hatton*, 356 F.3d at 965 (no evidence California's registration requirement has an objective to shame, ridicule, or stigmatize sex offenders). These decisions strongly point in a direction that indicates KORA's reporting requirements do not offend federal ex post facto principles.

"Additionally, the majority's analogy to probation is not persuasive. While probation/parole may have 'reporting' in common in the abstract, this is only one aspect

of many conditions attached to these punishments. For example, probationers are subject to searches of their persons and property simply on reasonable suspicion of a probation violation or criminal activity and are subject to random drug tests. They may also be required to avoid 'injurious or vicious habits' and 'persons or places of disreputable or harmful character'; permit state agents to visit their homes; remain in Kansas unless given permission to leave; work 'faithfully at suitable employment'; perform community service; go on house arrest; and even serve time in a county jail. K.S.A. 2011 Supp. 21-6607(b), (c).

"In sum, I do not believe the federal courts, more specifically the United States Supreme Court, would hold that this historical-form-of-punishment factor weighs toward an ex post facto violation.

"AFFIRMATIVE DISABILITY OR RESTRAINT

"The majority focuses next on what it characterizes as the 'more common restraint on an offender's freedom of movement' under KORA, which is the quarterly registration requirement in each applicable jurisdiction and the required $20 registration fee, as well as the KORA's broader definition of the word 'resides.' Slip op. at 38. The majority notes the registration costs, depending on circumstances, could be $80 to $240 annually.

"But the majority fails to explain how the federal courts would hold that these components of KORA would weigh this factor against the Kansas law. For example, no evidence was presented establishing that the KORA registration costs were a fine instead of a fee. See *Mueller v. Raemisch*, 740 F.3d 1128, 1134 (7th Cir. 2014) ('The burden of proving that it is a fine is on the plaintiffs . . . .').

"In *Mueller*, the Seventh Circuit recently upheld Wisconsin's annual $100 registration fee against a sex offender who moved out-of-state but was still required to register in Wisconsin. In doing so, the court noted first that plaintiff had done nothing to get over the first hurdle by presenting evidence regarding the fee versus the registration program's cost. 740 F.3d at 1134 ('[T]hey cannot get to first base without evidence that it

18

is grossly disproportionate to the annual cost of keeping track of a sex offender registrant—and they have presented no evidence of that either. They haven't even tried.'). Similarly, Doe has done nothing as to this evidentiary hurdle, yet the majority strikes this factor against KORA even though the burden is on the challenger and the statute is presumed constitutional.

"Second, the Seventh Circuit noted the nonpunitive purpose of collecting fees and where the responsibility lies for having to provide a registry, stating:

'The state provides a service to the law-abiding public by maintaining a sex offender registry, but there would be no service and hence no expense were there no sex offenders. As they are responsible for the expense, there is nothing punitive about requiring them to defray it.' 740 F.3d at 1135.

"If it is the potential for a total annual cost of $240 that offends the majority, what is the legal basis for that? The majority leaves this unexplained.

"Next, the majority holds that housing and employment problems result from the registry, which ties back to the widespread dissemination of information on the Internet discussed above, which *Smith* and the other federal courts have plainly rejected. But the majority believes KORA suffers an additional evidentiary blow because of direct evidence that Doe actually lost a job and housing opportunities because of the Internet registry. I disagree this tips the balance when the caselaw is considered.

"As noted earlier, my review of federal caselaw from *Smith* on down shows the courts have fully understood that actual consequences result from offender registration and have not dismissed these consequences simply as conjecture. See, *e.g.*, *Smith*, 538 U.S. at 99; *Parks*, 698 F.3d at 6 ('The prospective disadvantages to Parks from such publicity are obvious.'). Indeed, several courts have approved state laws that imposed actual residential living restrictions on offenders, which are literally off-limits zones disabling offenders from living in close proximity to schools, playgrounds, etc. See *Doe v. Miller*, 405 F.3d 700 (8th Cir. 2005) (Iowa's 2,000-foot buffer zone regulatory, not

19

punitive); *Salter v. State*, 971 So. 2d 31 (Ala. Civ. App. 2007) (approving 2,000-foot buffer zone); *People v. Leroy*, 357 Ill. App. 3d 530, 828 N.E.2d 769 (2005) (approving 500-foot buffer zone); *State v. Seering*, 701 N.W.2d 655 (Iowa 2005) (upholding 2,000-foot buffer zone); see also *Doe v. Bredesen*, 507 F.3d 998, 1004 (6th Cir. 2007)('The [Tennessee] Act's registration, reporting, and surveillance components are not of a type that we have traditionally considered as a punishment, and the district court correctly found that they do not constitute an affirmative disability or restraint in light of the legislature's intent.'); *Standley v. Town of Woodfin*, 186 N.C. App. 134, 650 S.E.2d 618 (2007) (upholding ban on entering public park); *Doe v. Baker*, No. Civ. A. 1:05-CV-2265, 2006 WL 905368 (N.D. Ga. 2006) (unpublished opinion) (upholding 1,000-foot buffer zone). Clearly, such exclusions cause lost opportunities for housing and employment for offenders, yet these prohibitions were upheld as nonpunitive.

"I am not persuaded the federal courts would find KORA to impose requirements traditionally considered to be affirmative disabilities or restraints to the point of weighing this factor against constitutionality.

"TRADITIONAL AIMS OF PUNISHMENT

"The third *Mendoza-Martinez* factor is whether the 'regulatory scheme . . . promotes the traditional aims of punishment.' *Smith*, 538 U.S. at 97. The Court has described those aims as retribution and deterrence. See, *e.g.*, *Mendoza-Martinez*, 372 U.S. at 168.

"The majority's analysis of this factor is muddled and difficult to unpack. It is unclear to me whether the majority is relying on the articles attached to Doe's summary judgment motion or its own intuition. As best as I can tell, the majority ultimately ignores the attachments and simply holds that KORA promotes traditional aims of punishment because the legislature increased the reporting term from 10 to 25 years. Slip op. at 41. But this conclusion is at odds with the federal caselaw.

"But the fact that KORA has a deterrent effect is not conclusive. The *Smith* Court found that '[a]ny number of government programs might deter crime without imposing

20

punishment' and "'[t]o hold that the mere presence of a deterrent purpose renders such sanctions 'criminal' . . . would severely undermine the Government's ability to engage in effective regulation." [Citations omitted.]' 538 U.S. at 102. The Court also rejected the lower court's finding that Alaska's registration obligations were retributive based upon the length of reporting differing between individuals convicted of nonaggravated offenses and those 'convicted of aggravated or multiple offenses.' 538 U.S. at 102. The Court found the 'categories . . . and the corresponding length of the reporting requirement are *reasonably related to the danger of recidivism*, and this is *consistent with the regulatory objective*.' (Emphasis added.) 538 U.S. at 102.

"The *Smith* Court's analysis is equally applicable to KORA, though not wholly dispositive because the Court was addressing a 15-year registration requirement and KORA has a 25-year requirement. But SORNA imposes a 25-year registration requirement on Tier II offenders and a lifetime requirement on Tier III offenders, 42 U.S.C. § 16915 (2012), and the federal courts addressing this issue have upheld SORNA based on *Smith*.

"The Eleventh Circuit addressed this registration requirement in *W.B.H.* and held that SORNA is no different than the Alaska act at issue in *Smith*. 664 F.3d at 858-59. The *W.B.H.* court reasoned that SORNA is 'reasonably related to the danger of recidivism posed by sex offenders.' 664 F.3d at 858. And the court explained that while SORNA 'allows the public and law enforcement to determine the general whereabouts of convicted sex offenders, . . . it does not directly restrict their mobility, their employment, or how they spend their time.' 664 F.3d at 858. So, the court found that any deterrent effect or purpose of SORNA does not justify a finding that the act's purpose is punitive. 664 F.3d at 858; see also *Under Seal*, 709 F.3d at 265 (quoting from *Smith* to find that SORNA does not promote traditional aims of punishment).

"I would find under *Smith* and the cases interpreting SORNA that the traditional aims of punishment factor weighs in favor of KORA being fairly characterized as nonpunitive.

21

"In *Smith*, the Court identified this as 'a "most significant" factor in our determination that the statute's effects are not punitive.' 538 U.S. at 102 (citing *United States v. Ursery*, 518 U.S. 267, 290, 116 S. Ct. 2135, 135 L. Ed. 2d 549 [1996]). The *Smith* Court did not elaborate on what is meant by 'rational connection to a nonpunitive purpose' before analyzing the Alaska act under the standard. One commentator has noted that the standard is 'deferential to the state purpose (much like rational basis review under substantive due process analysis).' Hobson, *Banishing Acts: How Far May States Go to Keep Convicted Sex Offenders Away from Children?*, 40 Ga. L. Rev. 961, 984 (2006). In *State v. Cook*, 286 Kan. 766, 774, 187 P.3d 1283 (2008), this court determined that 'the registration act was intended to promote public safety and to protect the public from sex offenders, who constitute a class of criminals that is likely to reoffend.'

"The majority concludes that arguably under the current version of KORA, 'public safety has become a pretext.' Slip op. at 42. The majority finds fault with KORA because it does not distinguish between types of offenders and contains no mechanism for relieving a 'fully rehabilitated' offender from its notification burdens. But the Ninth Circuit and others have rejected similar arguments. In *Matso*, the court held:

'Plaintiffs argue *Smith* overstated the risk of sex-offender recidivism. They note that *Smith* cited several studies on sex offender recidivism. *See id.* at 104. Plaintiffs then rely on an expert declaration critiquing the methodology of the recidivism studies in *Smith.* The district court did not make any factual finding regarding the risk of sex offender recidivism. Even had it adopted the declaration's conclusions as its own, a recalibrated assessment of recidivism risk would not refute the legitimate public safety interest in monitoring sex-offender presence in the community.' 670 F.3d at 1057.

See also *Bredesen*, 507 F.3d at 1006 (Tennessee Legislature 'could rationally conclude that sex offenders present an unusually high risk of recidivism, and that stringent registration, reporting, and electronic surveillance requirements can reduce that risk and

22

thereby protect the public' and concluding that '[w]here there is such a rational connection to a nonpunitive purpose, it is not for the courts to second-guess the state legislature's policy decision'). In addition, the Second Circuit recently held the New York Legislature's 'decision to eliminate the possibility of relief from registration for twenty years' for level one offenders did not render the registration provisions punitive. *Cuomo*, 755 F.3d at 112.

"The majority fails to cite any authority for its analysis of this factor; and the proposition that offender registration schemes are rationally related to the nonpunitive purpose of public safety finds overwhelming approval in the federal caselaw. Even *Myers*, 260 Kan. at 681, appears to assume offender registration is rationally connected to public safety, and the Alaska state case that held post-*Smith* changes to the Alaska act were an ex post facto violation admits registration, at least as to sex offenders, advances a nonpunitive public safety purpose. See *Doe v. State*, 189 P.3d 999, 1015-16 (Alaska 2008).

"I do not see how the majority can say no public safety purpose is rationally furthered by having sex, drug, and violent offenders register. I would follow the referenced precedent and hold that KORA has a rational connection to a nonpunitive purpose, so this factor does not weight towards punishment.

"EXCESSIVE IN RELATION TO REGULATORY PURPOSE

"In *Smith,* the Court clarified that '[t]he excessiveness inquiry of our ex post facto jurisprudence is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective.' 538 U.S. at 105. The *Smith* Court further noted that ex post facto jurisprudence does not preclude a state from making reasonable categorical judgments that certain crimes should have particular regulatory consequence.

"Instead of independently analyzing this factor, the majority merely harkens back to the ground it already plowed, concluding: 'Our discussion of the other factors has

23

touched upon the excessive nature of KORA.' Slip op. at 43. The majority then specifically cites the fact that the 2011 KORA amendments required more information from the offenders and that the penalty for noncompliance has increased. Slip op. at 43. I would hold that neither of these requirements is excessive given KORA's public safety purpose based on the authority cited above.

"CONCLUSION

"Although the 2011 KORA offender registration scheme imposes a number of burdens on sex offenders, I believe the applicable federal caselaw considering similar burdens under other offender registration schemes compels us to conclude that the 2011 KORA amendments do not violate the United States Constitution's Ex Post Facto Clause as applied to sex offenders and that the United States Supreme Court would so hold." *Doe v. Thompson*, 304 Kan. ___, ___ P.3d ___ (No. 110,318, this day decided), slip op. at 47-66 (Biles, J., concurring in part and dissenting in part).

Because we conclude the registration requirements Petersen-Beard complains of are not punishment, his claim that those requirements violate the Eighth Amendment's prohibition against cruel and unusual punishment cannot survive.

*KORA's lifetime sex offender registration requirements are not punishment for purposes of applying the Kansas Constitution.*

Having held that KORA's lifetime sex offender registration requirements are not punishment for purposes of applying our federal Constitution, we must next consider whether those same requirements might still be punishment for purposes of applying the Kansas Constitution. We conclude they are not.

Section 9 of the Kansas Constitution Bill of Rights provides that "[a]ll persons shall be bailable by sufficient sureties except for capital offenses, where proof is evident

24

or the presumption great. Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted."

"This court . . . can construe [its] state constitutional provisions independent of federal interpretation of corresponding provisions." *State v. Schultz*, 252 Kan. 819, 824, 850 P.2d 818 (1993). While we have the freedom to extend greater protection to Kansas citizens under the Kansas Constitution than exists under comparable provisions of the federal Constitution, we generally have not done so. See *State v. Spain*, 269 Kan. 54, 59, 4 P.3d 621 (2000); *Murphy v. Nelson*, 260 Kan. 589, 597, 921 P.2d 1225 (1996); *State v. Morris*, 255 Kan. 964, 981, 880 P.2d 1244 (1994); *Schultz*, 252 Kan. at 826.

However, we have shown a willingness to evaluate § 9 under a separate analytical framework. See *State v. Mossman*, 294 Kan. 901, 924, 281 P.3d 153 (2012) (explaining how proportionality analysis can differ between the two clauses). In this instance, however, we find no textual or historical evidence that the drafters of § 9 intended the meaning of "punishment" to differ from the same word's meaning as used in the Eighth Amendment to the United States Constitution.

The origins of the Eighth Amendment and similar state prohibitions ("punishments clauses"), such as § 9 of the Kansas Bill of Rights, are in the 1689 English Bill of Rights. See, *e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 966, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991); *Solem v. Helm*, 463 U.S. 277, 285 n.10, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983); 3 Story, Commentaries on the Constitution of the United States § 1896 (1833). By 1791, five state constitutions prohibited "cruel or unusual punishments." See Del. Declaration of Rights, sec. 16 (1776); Md. Declaration of Rights, art. 22 (1776); Mass. Declaration of Rights, art. XXVI (1780); N.C. Declaration of Rights, sec. 10 (1776); N.H. Bill of Rights, art. 33 (1784). Two others prohibited "cruel" punishments. See Pa. Const., art. IX, sec. 13 (1790); S.C. Const., art. IX, sec. 4 (1790). The Eighth Amendment most closely followed

the Virginia Declaration of Rights, which prohibited "cruel and unusual" punishment. Va. Declaration of Rights, sec. 9 (1776).

The Kansas Bill of Rights, adopted as part of the Wyandotte Constitutional Convention of 1859, was modeled after the Ohio Bill of Rights, although there were "a few transpositions and changes in phraseology." Perdue, The Sources of the Constitutions of Kansas, reprinted in 7 Kansas Historical Collections 130-151 (1902). Ohio had created a new constitution in 1851 and its punishments clause read: "All persons shall be bailable by sufficient sureties, except for capital offences where the proof is evident, or the presumption great. Excessive bail shall not be required; nor excessive fines imposed; nor cruel and unusual punishments inflicted." Ohio Const., art. I, § 9 (1851). Our § 9 tracks Ohio's § 9, but for one key distinction: "or" vs. "and." While this textual difference may support a divergent application of § 9 in some cases, it is immaterial to our decision today.

The record regarding the adoption of the Kansas Bill of Rights—and § 9 in particular—is scarce. We can find no textual or historical reason to depart from our general practice of giving an identical interpretation to identical language appearing in both the Kansas Constitution and our federal Constitution. There is no evidence that the word "punishment" meant anything different to the drafters of the Kansas Constitution than it did to the framers of the Bill of Rights. Therefore, we conclude the term punishment has the same meaning in § 9 as it does in the Eighth Amendment. Because we have held that KORA's sex offender registration requirements do not qualify as punishment as that word is used in the Eighth Amendment, we likewise conclude that those requirements are not punishment as that word is used in § 9.

Affirmed.

26

\* \* \*

JOHNSON, J., dissenting:  I dissent from the majority's decision in this case and from the majority's declaration that it is overruling the decisions in *State v. Redmond*, 304 Kan. ___, ___ P.3d ___ (No. 110,280, this day decided), *State v. Buser*, 304 Kan. ___, ___ P.3d ___ (No. 105,982, this day decided), and *Doe v. Thompson*, 304 Kan. ___, ___ P.3d ___ (No. 110,318, this day decided), which I will hereafter collectively refer to as "Ex Post Facto cases."

The majority does not explain the unusual circumstance whereby the opinions in the September 2014 Ex Post Facto cases are being filed on the same day as the opinion in this September 2015 case that purports to overrule their holdings. I firmly believe that some explanation is warranted in the interests of clarity and transparency. Moreover, I want to assure that the defendants in the Ex Post Facto cases obtain the relief to which they are entitled.

The "overruled" Ex Post Facto cases dealt with the question of whether article I, § 10 of the United States Constitution—the Ex Post Facto Clause—prohibited the retroactive application of the 2011 amendments to the Kansas Offender Registration Act (KORA), K.S.A. 22-4901 *et seq*. An initial consideration was whether KORA was even subject to the Ex Post Facto Clause. The three cases were set together and heard on this court's docket on September 11, 2014.

At that time, and for some 3 months thereafter, a position on this court was open due to the appointment of our colleague, Nancy Moritz, to the United States 10th Circuit Court of Appeals. Consequently, the Chief Justice utilized his constitutional and/or statutory authority to assign a senior district court judge as the seventh member of this court to hear and decide cases coming before the court during the vacancy period, which

27

included the September 2014 docket. See K.S.A. 20-2616(b) ("A retired justice or judge so designated and assigned to perform judicial service or duties shall have the power and authority to hear and determine all matters covered by the assignment."); see also Kan. Const. art. 3, § 6(f) ("The supreme court may assign a district court judge to serve temporarily on the supreme court."). Notably, our constitution does not restrict or limit the power and authority of a temporarily assigned justice nor does it restrict or limit the precedential effect of the decisions issued by a supreme court that includes a justice that is temporarily assigned. Indeed, the Chief Justice often announces at oral argument that a temporarily assigned jurist will be fully participating in the decision of the court.

As evidenced by the opinions that are now being publicly filed, a majority of the constitutionally constituted court hearing the Ex Post Facto cases voted to hold that KORA's statutory scheme, after the 2011 amendments, was so punitive in effect as to negate any implied legislative intent to deem it civil, so that it was subject to the Ex Post Facto Clause's prohibition on retroactive application. The decision specifically left intact all provisions of the 2011 iteration of KORA for any person who committed a qualifying offense after July 1, 2011, the effective date of the 2011 amendments. In other words, the majority opinion in the Ex Post Facto cases did not hold KORA unconstitutional, but rather it held that the retroactive application of KORA's amendments was unconstitutional. The prohibitions against cruel and/or unusual punishment in our federal and state constitutions were neither raised as issues nor discussed by this court in the Ex Post Facto cases.

By August 2015, the opinion in *Thompson*, the lead Ex Post Facto case, was ready to be filed with the Clerk of the Appellate Court. By that time, the vacancy on this court had been filled and this case had been set on a docket to be heard by the newly constituted court the following month, September 16, 2015, *i.e.*, a year after the arguments in *Thompson.* Thereupon, notwithstanding that the outcome for the Ex Post

28

Facto litigants would be unaffected by any subsequent ruling in another case, a majority of the Ex Post Facto court ordered that the opinions in those cases were to be held in abeyance pending the newly constituted court's hearing and resolution of Petersen-Beard's cruel and unusual punishment case.

Then, after a majority of the court in this case determined that it could overrule the holdings in the Ex Post Facto cases for all future litigants—as disclosed in the majority opinion above—a majority of the Ex Post Facto court ordered that the release of the Ex Post Facto cases was to be further delayed until this *Petersen-Beard* opinion was ready to be filed. The apparent rationale for the delay was to make the holding in the Ex Post Facto cases applicable solely to the parties in those cases.

To be clear, this *Petersen-Beard* opinion does not change the result for the Ex Post Facto defendants, *i.e.*, John Doe in *Doe v. Thompson*, No. 110,318; Joseph M. Buser in No. 105,982; and Promise Delon Redmond in No. 110,280. Likewise, Leonard D. Charles, whose case No. 105,148 was heard on the same docket as the Ex Post Facto cases, will be governed by the holding in his case. Plainly stated, all of those litigants won on appeal, and the KORA amendments cannot be applied to them. But they had to wait for many months—unnecessarily in my view—to reap the benefits of their respective wins. I find that to be a denial of justice.

Turning to the merits of this case, I begin by clarifying what is before us to be decided. The issue presented here was whether the KORA provision requiring Petersen-Beard to register as a sex offender for the rest of his life was unconstitutionally cruel and unusual punishment under the Eighth Amendment to the United States Constitution or unconstitutionally cruel or unusual punishment under § 9 of the Kansas Constitution Bill of Rights. The Ex Post Facto Clause of article I, § 10 of the United States Constitution was not in play here. Moreover, the issue is not limited to retroactivity, but rather

29

Petersen-Beard seeks to nullify KORA's lifetime registration provision for all offenders, both past and future. In other words, the issue in this case is not the same issue presented in the cases it purports to overrule, notwithstanding the possibility that the analyses might overlap in some respects.

Further, the question of whether KORA is subject to the cruel and unusual constraint of the Eighth Amendment to the United States Constitution was not presented to or decided in the Ex Post Facto cases. Consequently, the majority's assertion that its determination that KORA is not punitive for Eighth Amendment purposes requires the reversal of the prior Ex Post Facto cases is dictum. See *Law v. Law Company Building Assocs.*, 295 Kan. 551, 564, 289 P.3d 1066 (2012) (nobody bound by dictum, not even the court that issued it). If this case is to provide authority for the proposition that the Ex Post Facto Clause does not apply to KORA because the act is nonpunitive for both Eighth Amendment and Ex Post Facto purposes, then a subsequent case that presents that precise issue can make that determination. Accordingly, the litigants of that subsequent case could challenge the applicability of the federal circuit courts of appeal cases addressing the constitutionality of the Sex Offender Registration and Notification Act (SORNA), 42 U.S.C. § 16901 *et seq.* (2012), upon which the majority in this case relies to conflate the two types of cases.

Likewise, the *Thompson* dissent, adopted as the majority's rationale, presents string cites to federal circuit courts of appeal decisions that analyze the constitutionality of SORNA or other states' registration acts in light of those federal circuit courts' mandatory authority from the United States Supreme Court. While perhaps interesting, those citations are only tangentially connected to the issue before this court. Our task, as the *Kansas* Supreme Court, is to rule on the constitutionality of the *Kansas* registration act. A federal court's determination that a federal act is constitutional might be used as an analog to inform a state court's decision on its own laws, but state courts are not bound by

any lower federal court decision, even on matters of federal constitutional law. As stated by a member of the United States Supreme Court:

> "The Supremacy Clause demands that state law yield to federal law, but neither federal supremacy nor any other principle of federal law requires that a state court's interpretation of federal law give way to a (lower) federal court's interpretation. In our federal system, a state trial court's interpretation of federal law is no less authoritative than that of the federal court of appeals in whose circuit the trial court is located." *Lockhart v. Fretwell*, 506 U.S. 364, 376, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993) (Thomas, J., concurring).

Ordinarily, any analysis of a Kansas legislative act would not begin with a consideration of merely persuasive federal authority when there are decisions of this court on point. If there is direct authority in this State, it is binding on the lower State courts and is entitled to the benefit of the doctrine of stare decisis in this court. In *Thompson*, the majority opinion began its analysis by discussing the direct authority of *State v. Myers*, 260 Kan. 669, 699, 923 P.2d 1024 (1996), *cert. denied* 521 U.S. 1118 (1997), which held that the disclosure provisions of a prior registration law—the Kansas Sex Offender Registration Act (KSORA)—were punitive in effect, precluding their retroactive application under the Ex Post Facto Clause. The State in *Thompson* had argued that *Myers* was overruled by the United States Supreme Court's decision in *Smith v. Doe*, 538 U.S. 84, 103-04, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003). But that was not accurate, because *Smith* did not review the *Myers* decision and did not even consider the Kansas registration act. Rather, the *Smith* court held that the Alaska Sex Offender Registration Act (ASORA) was nonpunitive and not subject to the Ex Post Facto Clause. Accordingly, *Smith* is important only as a guide as to how the United States Supreme Court might view KORA for federal constitutional purposes; it is not direct, mandatory authority that KORA is nonpunitive.

The *Thompson* dissent obliquely recognized that *Smith* was not directly binding in that Ex Post Facto case when it stated that "the real question presented" was: "Are there convincing reasons to believe the United States Supreme Court would view KORA differently than it viewed the Alaska law in 2003 when it decided *Smith*?" *Thompson*, slip op. at 49 (Biles, J., concurring in part and dissenting in part). Of course, the majority's recitation of that issue statement presents an incomplete picture in Peterson-Beard's case because of the State constitutional provision in play here. The United States Supreme Court does not have authority to interpret § 9 of the Kansas Constitution Bill of Rights. It is this court's view of KORA that will decide that issue, even if this court chooses to adopt a rationale consistent with the *Smith* majority. The majority must own that decision; it cannot hide behind federal decisions.

Setting aside for a moment the State constitutional question, the answer to the question posed by the *Thompson* dissent is *yes*, there are convincing reasons to believe that the United States Supreme Court, in 2016, would view the current version of KORA differently than it viewed ASORA in 2003, when it decided *Smith*. The majority in *Thompson* attempted to explain those reasons, and I will reiterate some of them here, albeit I do not intend to clip and paste the entire majority opinion into this dissent. In addition, I will present some points that were not explicitly made in *Thompson*.

March 5, 2016, marked 13 years since *Smith* was decided, and there are new justices now. Five of the justices involved in the *Smith* decision, *i.e.*, 55.56% of the Court, are no longer on the Court. Three of the five justices (60%) joining the majority opinion in *Smith*, upon which the *Thompson* dissent heavily relies, are no longer on the Court. Surely, the majority here, especially the *Thompson* dissenters, can appreciate the impact of a change in Court composition.

And not only are the new justices different, but they are younger, which might well make them more attuned to the digital age. For instance, the youngest member of the current court was about 21 years old when IBM introduced the PC (personal computer) in 1981, as compared to Chief Justice Rehnquist—a member of the *Smith* majority—who was approaching 60 years old when the personal computer revolution began to go mainstream. The *Smith* majority, authored by Justice Kennedy, who was 67 years old at the time, described Alaska's posting of registration information on the Internet as a passive system, akin to physically visiting "an official archive of criminal records," 538 U.S. at 99.

In contrast, in *Riley v. California*, 573 U.S. ___, 134 S. Ct. 2473, 2491, 189 L. Ed. 2d 430 (2014), a majority of the 2013 Term Supreme Court noted that ordinary citizens with smartphones can easily access vast amounts of data and that "a cell phone [can be] used to access data located elsewhere, at the tap of a screen." 573 U.S. at ____, 134 S. Ct. at 2491. That data includes push notifications of sex offender registries and indiscriminate sharing of social media. Certainly, if nothing else, a majority of the Court must now recognize that ubiquitous tweeting and other social media have changed the landscape of information sharing. Pointedly, Twitter did not exist until 3 years after *Smith* was decided. In short, I believe a majority of the current Supreme Court would be more attuned to the repercussions of Internet dissemination of a sex offender registry.

In this State, *Myers* displayed a great deal of prescience. It held that despite how one might try to justify the disclosure provisions of KSORA, the repercussions visited upon Myers were "great enough . . . to be considered punishment. The unrestricted public access given to the sex offender registry is excessive and goes beyond that necessary to promote public safety." 260 Kan. at 699. *Myers* fretted that "[t]he print or broadcast media could make it a practice of publishing the list [of sex offenders] as often as they chose." 260 Kan. at 697. Not only has that circumstance come to pass, but the

33

unnecessary digital distribution of the sex offender registry has gone far beyond that imagined by the *Myers* court. In other words, the punitive effect on offenders is even greater now.

The explanation that the repercussions to which *Myers* referred arise from the fact that the offender was convicted in a public proceeding and the records of that conviction are public information is nonsensical. The whole purpose of the registry is to provide easy access to information that most people would not know. It is the wide dissemination of the information that causes the punitive effect. Moreover, the public record of conviction does not provide the wealth of current information about the offender that he or she must provide for the sex offender registry and keep updated. Public shaming is much more effective if the public knows where the offender lives, works, and/or attends school, as well as the make, model, and license number of the vehicle he or she drives.

Likewise, the attempted rationale that an Internet-based registry is merely the dissemination of accurate information is unpersuasive. An example of traditional public shaming referred to in *Myers* came from Nathaniel Hawthorne's *The Scarlet Letter* (Random House 1950) (1850), in which Hester Prynne's punishment for adultery required her to wear a scarlet "A" upon her dress. One could describe the information being conveyed by that scarlet letter as "accurate information." Yet, Hawthorne described its punitive effect as follows: "'There can be no outrage . . . against our common nature,— whatever be the delinquencies of the individual,—no outrage more flagrant than to forbid the culprit to hide his face for shame; as it was the essence of this punishment to do.'" *Artway v. Attorney General of State of N.J.*, 81 F.3d 1235, 1265 (3d Cir. 1996) (quoting *The Scarlet Letter*, 63-64). Further, one has to challenge the accuracy of the disseminated information when it does not differentiate between the extremely low-risk offenders and the extremely dangerous high-risk offenders. Ultimately, however, the point is that,

despite the spin the majority would put on it, today's dissemination of sex offender registry information does resemble traditional forms of punishment.

In *Thompson*, we set forth KORA's onerous requirements and differentiated them from both *Smith*'s ASORA and the dissent's SORNA. It is unfathomable to me that any rational person could say with a straight face that being forced to comply with those Draconian terms and conditions of registration for the rest of one's life, under penalty of going to prison for a new felony, is not an affirmative disability or restraint on the offender. The majority quibbles over whether the required monetary payments due each quarterly reporting date is a fine or fee. But *Smith* described the intent-effects test as being in two parts, whereby the second step examines the "punitive . . . purpose or effect." 538 U.S. at 92. I submit that a substantial fee, even if its *intent* is to cover the government's cost of the registry, can have a punitive *effect* on the offender who might be living hand-to-mouth because of problems getting and maintaining employment.

Moreover, although the majority compares individual provisions of KORA to corresponding provisions in SORNA, in the *Thompson* majority we cautioned that

> "it is important to keep in mind that it is the entire 'statutory scheme' that must be examined for its punitive effect. See *Smith*, 538 U.S. at 92 (effects analysis requires the appellate court to 'examine . . . the *statutory scheme*' [emphasis added]); *Myers*, 260 Kan. at 681 (quoting *United States v. Ward*, 448 U.S. 242, 248-49, 100 S. Ct. 2636, 65 L. Ed. 2d 742 [1980]) ('ask whether the "*statutory scheme* was so punitive either in purpose or effect"' [emphasis added]). For instance, a particular registration requirement may not have the same punitive effect in a statutory scheme that permits a reduction in registration time for proven rehabilitation, as it does in a statutory scheme that precludes any individualized modifications." *Thompson*, slip op. at 35-36.

That distinction is particularly compelling when considering that SORNA allows an offender the opportunity to reduce his or her registration time, whereas under KORA there is no opportunity for relief from lifetime registration even for a completely rehabilitated offender. The punitive effect of being required to register in person quarterly might be mitigated if the requirement could be terminated when it was no longer necessary, rather than mandatorily continuing for a lifetime.

Perhaps the most compelling reason for the current Supreme Court to view KORA differently than the *Smith* Court viewed ASORA involves the last two factors discussed by the majority:  whether the statutory scheme is rationally connected to a nonpunitive purpose; and whether the statutory scheme is excessive in relation to the identified nonpunitive purpose.

*Smith* analyzed ASORA against the nonpunitive purpose of public safety. The Court opined that a registration act need not be "'narrowly drawn to accomplish the stated purpose,'" so long as "the Act's nonpunitive purpose is [not] a 'sham or mere pretext.' *Hendricks*, 521 U.S., at 371 (KENNEDY, J., concurring)." *Smith*, 538 U.S. at 103. *Smith* then determined that "Alaska could conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism." 538 U.S. at 103. The *Smith* majority then supported that ruling as follows:

> "The risk of recidivism posed by sex offenders is 'frightening and high.' *McKune v. Lile*, 536 U.S. 24, 34[, 122 S. Ct. 2017, 153 L. Ed. 2d 47] (2002), see also *id.*, at 33 ('When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault' (citing U.S. Dept. of Justice, Bureau of Justice Statistics, Sex Offenses and Offenders 27 (1997); U.S. Dept. of Justice, Bureau of Justice Statistics, Recidivism of Prisoners Released in 1983, p. 6 (1997)))." 538 U.S. at 103.

The Court then determined that "[t]he duration of the reporting requirements is not excessive," because research on child molesters had shown that most of them do not reoffend within the first several years after release, but rather a reoffense may occur "'as late as 20 years following release.' National Institute of Justice, R. Prentky, R. Knight, & A. Lee, U.S. Dept. of Justice, Child Sexual Molestation: Research Issues 14 (1997)." 538 U.S. at 104. But a recent investigation into the source of *Smith*'s seemingly compelling statistics calls into question their bona fides.

In *"Frightening and High"*: *The Supreme Court's Crucial Mistake About Sex Crime Statistics*, 30 Const. Comment. 495 (2015), the authors Ira and Tara Ellman point out that Justice Kennedy, the author of the *Smith* majority, was also the author of a four-person plurality decision in *McKune*, which is *Smith*'s cited source for the "frightening and high" statistic. In *McKune*, Justice Kennedy wrote that the recidivism rate of untreated sex offenders "'has been estimated to be as high as 80%,'" which he later referred to as "'a frightening and high risk of recidivism.'" 30 Const. Comment. at 495-96 (quoting *McKune*, 536 U.S. at 33-34). The source of the 80% statement—apparently taken from a reference in an *amicus* brief filed by the Solicitor General—was cited as the U.S. Dept. of Justice, Nat. Institute of Corrections, *A Practitioner's Guide to Treating the Incarcerated Male Sex Offender*, xiii (1988). Although that Practitioner's Guide was published by the Justice Department, its "Preface notes that its contents present the views 'of the authors and do[es] not necessarily represent the official position or policies of the U.S. Department of Justice.'" 30 Const. Comment. at 498 n.11. The Practitioner's Guide cited a 1986 article in Psychology Today as the source of its claim. That mass-marketed magazine article—designed for a lay audience—contained the following bare assertion, without attribution or supporting reference: "'Most untreated sex offenders released from prison go on to commit more offenses—indeed, as many as 80% do.'" 30 Const. Comment. at 498 (quoting Freeman-Longo & Wall, *Changing a Lifetime of Sexual Crime*, Psychology Today, March 1986, at 64). The author of the magazine article was a

37

counselor who was touting his prison counseling program for sex offenders and whose "unsupported assertion about the recidivism rate for untreated sex offenders was offered to contrast with [the counselor's] equally unsupported assertion about the lower recidivism rate for those who complete [the counselor's] program." 30 Const. Comment. at 498.

The article did not stop at challenging the factual support for *McKune*'s "frightening and high" finding. It cited to studies utilizing accepted methodologies to support the proposition that the purported 80% risk of reoffending was way off base, both as a stand-alone statistic for sex offenders and as a comparison to other offenders. "One recent study found that about 3% of felons with *no* known history of sex offenses commit one within 4.5 years of their release," whereas "[a]bout 97.5% of the low-risk offenders were offense-free after five years." 30 Const. Comment. at 502-04. In other words, the risk of recidivism within 5 years of release from prison for a low-risk sex offender (about 2.5%) is virtually identical to that of a released prisoner who was not convicted of a sex offense (about 3.0%).

Further, the sample group of the study *Smith* used to declare that reoffenses do not occur within the first several years of release, but rather "may occur 'as late as 20 years following release,'" 538 U.S. at 104, consisted of "rapists and child molesters released from the Massachusetts Treatment Center for Sexually Dangerous Persons, established in 1959 'for the purpose of evaluating and treating individuals convicted of repetitive and/or aggressive sexual offenses.'" 30 Const. Comment. at 503 n.29 (citing Prentky, Lee, Knight, & Cerce, *Recidivism Rates Among Child Molesters and Rapists: A Methodological Analysis*, 21 L. & Hum. Behav. 635, 637 [1997]). While the public might assume that everyone on the sex registry is a forcible rapist or molester of young children, that is simply not the reality, as evidenced by the facts of this case. But even for the offenders initially assessed as high-risk, the likelihood of reoffending decreases over

38

time. "Those who haven't re-offended after fifteen years are not high-risk for doing so, regardless of their offense or their initial risk assessment." 30 Const. Comment. at 503.

The article recognized that human nature is such that, when faced with an immeasurable fear and strongly held belief, a person will tend to ignore or discount quantifiable facts. "The label 'sex offender' triggers fear, and disgust as well. Both responses breed beliefs that do not yield easily to facts." 30 Const. Comment. at 508. Yet, I must cling to the belief that the persons who have been privileged to serve on our nation's highest Court will yield to the facts and give a closer look at whether our statutory scheme is rationally connected to the nonpunitive purpose of public safety and whether its terms and conditions are excessive in relation to that public safety purpose. If they do, I submit that an objective analysis will disclose that, in the current version of KORA, public safety has crossed over the line and is now a "sham or mere pretext" for imposing additional punishment on the offender.

The *Thompson* majority pointed out that KORA does not differentiate between the young immature adult whose indiscretion with a consenting and encouraging teenager has led to a qualifying conviction and the middle-aged confirmed and incorrigible rapist and pedophile. We said that mixing in low-or-no-risk offenders with the high-risk offenders created an overinclusive system where "[t]oo much [was] too little." *Thompson*, slip op. at 42. In other words, "[i]f the registry's main purpose is to let us monitor and warn people about those who committed violent, coercive, or exploitative contact sex offenses, we dilute its potential usefulness when we fill it up with people who never did any of those things." 30 Const. Comment. at 504.

We also pointed out in the *Thompson* majority that KORA's statutory scheme was also too underinclusive to be rationally related to the nonpunitive purpose of public safety. *Thompson*, slip op. at 42-43. For the registry to provide effective public safety, it

should notify the public of all persons known to have committed acts considered to be sex offenses. Yet, only persons *convicted* of a qualifying crime are required to register.

It is not uncommon for a prosecutor to entice a plea agreement from a defendant charged with a registration-qualifying sex offense by offering to amend the charge to a crime that will not require the defendant to register. Certainly, that circumstance dilutes the State's argument that nullifying KORA in any respect will leave the young children of this State defenseless—the State effects the same result through a plea agreement. But more importantly for our purposes, one would think that, if the legislature's true intended purpose for the registry was public safety, it would have prohibited prosecutors and courts from circumventing the public's safety through a plea bargain. The legislature has demonstrated that it knows how to do that for driving under the influence (DUI): "No plea bargaining agreement shall be entered into nor shall any judge approve a plea bargaining agreement entered into for the purpose of permitting a person charged with [DUI] . . . to avoid the mandatory penalties established by this section . . . ." K.S.A. 2015 Supp. 8-1567(m).

Likewise, the registry would not include a person who has committed a qualifying sex offense but who avoided being convicted of the crime on some legal basis. For instance, an acquittal could follow the court's suppression of illegally obtained evidence. While the exclusionary rule will entice proper police conduct in the future, the exclusion of the sex offender from the registry does not further its purpose of public safety. In another area deemed to be a civil regulatory statutory scheme, the Sexually Violent Predator Act, K.S.A. 2015 Supp. 59-29a01 *et seq*., the legislature made a provision for the civil commitment of a qualifying person, even where that person was deemed incompetent to stand trial in his or her criminal case. K.S.A. 2015 Supp. 59-29a07(g). No similar procedure is in place under KORA, further rendering its public safety purpose suspect.

Given the foregoing, together with the other points made in the *Thompson* majority, I have every confidence that the United States Supreme Court would find that the current "statutory scheme [of KORA] '"is so punitive either in purpose or effect as to negate [the State's] intention" to deem it "civil."'" See *Smith*, 538 U.S. at 92. Accordingly, even under the issue framed by the *Thompson* dissent and adopted by the majority here, Petersen-Beard should prevail.

But even though that was the end of the analysis in *Thompson*, we have more to discuss in this case. The Kansas Constitution was not involved in *Redmond*, *Buser*, or *Thompson*, because our state constitution does not contain an ex post facto provision. It is involved here, however, because, in addition to the Eighth Amendment's prohibition against cruel and unusual punishment, our own constitution—in § 9 of the Kansas Constitution Bill of Rights—prohibits "cruel or unusual punishment." The majority recognizes that this court can independently interpret our own State constitution in a manner that extends greater protection to our Kansas citizens than the United States Supreme Court has provided under its interpretation of the United States Constitution. Then, it dismisses that proposition with the superficial rationale that "we generally have not done so" and "[w]e can find no . . . reason to depart from our general practice." Slip op. at 24-26.

I will not prolong this dissent with a discussion of the historical development of this court's practice of simply adopting federal constitutional interpretation for similar State constitutional provisions, or my opposition to such a practice. Suffice it to say that it has not always been that way. See Monnat & Nichols, *The Loneliness of the Kansas Constitution*, 34 J. Kan. Ass'n Just. 10, 11 (September 2010) ("In its early opinions, the Kansas Supreme Court routinely interpreted the Kansas constitution as an independent document with force of its own.").

41

More importantly, even if we adopt the federal analytical model, we need not apply it to Kansas' statute in the same manner as the United States Supreme Court applied it to Alaska's statute. Indeed, after *Smith*, the Alaska Supreme Court considered the same statute in the same case with the same defendants, utilizing the same intent-effects test and *Mendoza-Martinez* factors to determine the same ex post facto issue, albeit under the Alaska state constitution. The state court found that its statute, ASORA, violated the Ex Post Facto Clause of the Alaska state constitution, concluding:

> "Because ASORA compels (under threat of conviction) intrusive affirmative conduct, because this conduct is equivalent to that required by criminal judgments, because ASORA makes the disclosed information public and requires its broad dissemination without limitation, because ASORA applies only to those convicted of crime, and because ASORA neither meaningfully distinguishes between classes of sex offenses on the basis of risk nor gives offenders any opportunity to demonstrate their lack of risk, ASORA's effects are punitive. We therefore conclude that the statute violates Alaska's ex post facto clause." *Doe v. State*, 189 P.3d 999, 1019 (Alaska 2008).

In the *Thompson* majority, we found it interesting that the Alaska court had cited with approval to *Myers*, even after the *Smith* decision. See *Doe*, 189 P.3d at 1017. We also noted that other states have found their sex offender registration statutes constrained by their state constitutions. See, *e.g.*, *Wallace v. State*, 905 N.E.2d 371, 377-78 (Ind. 2009); *Doe v. Dept. of Public Safety and Correctional Services*, 430 Md. 535, 547-48, 62 A.3d 123 (2013); *State v. Williams*, 129 Ohio St. 3d 344, 347-49, 952 N.E.2d 1108 (2011); *Starkey v. Oklahoma Dept. of Corrections*, 2013 OK 43, ¶¶ 76-79, 305 P.3d 1004 (2013).

In short, even if we were not convinced that the United States Supreme Court would find KORA punitive, we can and should still find that it is so punitive in effect as

to negate any pretended civil regulatory purpose under our State constitution. The citizens of this State are entitled to have their own Supreme Court interpret their own constitution in a logical, rational manner that is consistent with actual, not made-up, facts. Consequently, I would find that this matter should proceed to a determination of the cruel or unusual analysis.

* * *

BEIER and ROSEN, JJ., join Justice Johnson's dissent as to the result. See *Doe v. Thompson*, 304 Kan. ___, ___ P.3d ___ (No. 110,318, this day decided); *State v. Buser*, 304 Kan. ___, ___ P.3d ___ (No. 105,982, this day decided); and *State v. Redmond*, 304 Kan. ___, ___ P.3d ___ (No. 110,280, this day decided); see also *State v. Charles*, 304 Kan. ___, ___ P.3d ___ (No. 105,148, this day decided) (following *Doe*, *Buser*, *Redmond*; imposition of registration requirement for violent offender qualifies as punishment, entitling defendant to relief under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 [2000]).